COUNTY OF FREEBORN, BY ROBERT C. TUVESON, ITS
COUNTY ATTORNEY, v. WILLIAM H. BRYSON
AND ANOTHER.
STATE, BY WILLIAM H. BRYSON AND ANOTHER,
v. COUNTY OF FREEBORN AND OTHERS.

243 N. W. 2d 316.

June 18, 1976—Nos. 45601, 45602, 45610.

---

*Christian, Slen, Savelkoul, Johnson & Broberg* and *Rolf O. Slen,* for the Brysons.

*Warren Spannaus,* Attorney General, *Peter W. Sipkins,* Solicitor General, and *James P. Gerlach,* Special Assistant Attorney General, for the state.

*Will Hartfeldt* and *Carol L. Moore,* for the Sierra Club.

*Bob A. Goldman,* County Attorney, and *Robert C. Tuveson,* Assistant County Attorney, for Freeborn County.

YETKA, JUSTICE.

Three appeals from a judgment refusing to enjoin Freeborn County from constructing a highway across a natural wildlife marsh, entered following denial of a post-trial motion for amended findings. We reverse.

Because our decision is based on a perceived legislative intent

to subordinate the county's interest in highways to the state's paramount concern for the protection of natural resources, it is worthwhile at the outset to quote at length from the applicable portions of the Environmental Rights Act, Minn. St. c. 116B (hereinafter the Act).

"The legislature finds and declares that each person is entitled by right to the protection, preservation, and enhancement of air, water, land, and other natural resources located within the state and that each person has the responsibility to contribute to the protection, preservation, and enhancement thereof. The legislature further declares its policy to create and maintain within the state conditions under which man and nature can exist in productive harmony in order that present and future generations may enjoy clean air and water, productive land, and other natural resources with which this state has been endowed. Accordingly, it is in the public interest to provide an adequate civil remedy to protect air, water, land and other natural resources located within the state from pollution, impairment, or destruction." Minn. St. 116B.01.

"Natural resources shall include, but not be limited to, all mineral, animal, botanical, air, water, land, timber, soil, quietude, recreational and historical resources." Minn. St. 116B.02, subd. 4.

" 'Person' means any natural person, any state, municipality or other governmental or political subdivision or other public agency or instrumentality, any public or private corporation, any partnership, firm, association, or other organization, any receiver, trustee, assignee, agent, or other legal representative of any of the foregoing, and any other entity, except a family farm, a family farm corporation or a bona fide farmer corporation." Minn. St. 116B.02, subd. 2.

" 'Pollution, impairment or destruction' is * * * any conduct which materially adversely affects or is likely to materially adversely affect the environment * * *." Minn. St. 116B.02, subd. 5.

"Any person * * * may maintain a civil action in the district

court for declaratory or equitable relief in the name of the state of Minnesota against any person, for the protection of the air, water, land, or other natural resources located within the state, whether publicly or privately owned, from pollution, impairment, or destruction * * *." Minn. St. 116B.03, subd. 1.

"In any other action [not based on violation of administrative regulations or orders] maintained under section 116B.03, whenever the plaintiff shall have made a prima facie showing that the conduct of the defendant has, or is likely to cause the pollution, impairment, or destruction of the air, water, land or other natural resources located within the state, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also show, by way of an affirmative defense, that there is no feasible and prudent alternative[1] and the conduct at issue is consistent with and reasonably required for promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its air, water, land and other natural resources from pollution, impairment, or destruction. Economic considerations alone shall not constitute a defense hereunder." Minn. St. 116B.04.

This case was before us earlier. At that time we stated that the provisions of the Act limit the county's power of eminent domain. We said:

"* * * From the language of the act, we conclude that the legislature intended in appropriate cases that the power of eminent domain possessed by governmental subdivisions— including the power of a county to condemn land for a public highway—was to be limited by the provisions of the act." County of Freeborn v. Bryson, 297 Minn. 218, 227, 210 N. W. 2d 290, 296 (1973).

---

[1] In our first opinion, we inadvertently spoke of a "reasonable or prudent alternative." County of Freeborn v. Bryson, 297 Minn. 218, 229, 210 N. W. 2d 290, 298 (1973). However, it is clear from the language of the statute that the legislature intended two elements of a single affirmative defense.

Despite our admonition, it is evident from the facts of this case that the county continues to resist the state policy established in the Act.

When this case was first before us, the county proposed to construct the highway along the property line separating farms owned by William H. and Arlene Bryson (Bryson) and Peterson, Peterson & Thunstadt, a farming partnership (Peterson). The marshland which would be traversed meanders through both properties, but is an integrated ecological unit. 297 Minn. 228, 210 N. W. 2d 297. Bryson opposes the highway. Condemnation proceedings against the Bryson property were initiated on June 2, 1971. Bryson, with the Sierra Club and the state as intervenors, sought injunctive relief pursuant to Minn. St. 116B.03, subd. 1, in order to protect the marsh. The trial court dismissed the environmental action for failure to establish a prima facie case, but on appeal we reversed and remanded.

In reversing, this court held that a prima facie case had been established because the marsh was a "natural resource" as defined in Minn. St. 116B.02, subd. 4, and the proposed highway construction would "materially adversely affect" that resource within the meaning of Minn. St. 116B.02, subd. 5. However, because Bryson operated a family farm and was excluded by definition in Minn. St. 116B.02, subd. 2, from the term "person" against whom an environmental action could be brought, this court expressed its concern that an injunction against the county might be futile if Bryson did not thereafter preserve the marsh himself.

"We therefore conclude that the Brysons and intervenors have established a prima facie case under the Environmental Rights Act. This, however, *represents only the barest of prima facie showings* because there is no certainty that the wildlife area will be continued as a natural resource by the landowner. It has only been shown that, at present, the area constitutes a protectable natural resource. A travesty of justice would occur if, after the the county rerouted the highway at a higher cost resulting in a

less desirable highway, the landowner or his successor decided to divert the area to other uses. An action under the act could not prevent such conduct since a family farm is excepted from suit." 297 Minn. 228, 210 N. W. 2d 297. (Italics supplied.)

To bolster his prima facie case, after this court's reversal but before the trial on remand, Bryson gave to the state a perpetual wildlife easement over that portion of the marsh located on Bryson property. As a result, the trial court recognized that the prima facie case with respect to the Bryson marsh was no longer the "barest" of showings, and enjoined highway construction along the route originally proposed.

A second development also occurred after reversal but before the trial on remand. The county had planned a right-of-way 100 feet wide along the property line separating the Bryson and Peterson farms. An easement 50 feet wide had already been acquired on the Peterson side of the property line. When it became apparent that the remaining 50 feet on the Bryson side might not be successfully obtained because of the Environmental Rights Act litigation, the county obtained from Peterson 75 additional feet contiguous to the 50 feet acquired earlier. Manifestly, this second route would impair and destroy the marsh in substantially the same way that this court and the trial court have acknowledged the route originally proposed would do. The second route is virtually identical in relation to the marsh, having been moved over 50 feet to circumvent the Bryson property line. Nevertheless, the trial court would permit highway construction over this second route.

Bryson had proposed an alternative route circumventing the marsh entirely by passing to the west on Peterson's property. The trial court conceded that this was a possible alternative route and that it would probably not result in "significant increased costs of construction." However, the alternative would shorten some of Peterson's crop rows and thus impair the efficiency of his farm operations. The trial court then balanced the anticipated impairment of Peterson's farming interest against the environ-

mental values which would be protected if this alternative route were used and concluded that the route traversing the marsh was more desirable. We do not find substantial evidence to support that finding by the trial court. While this court will always hesitate to overturn a finding by a trial court, we must do so when the facts warrant it. In State v. Raymond, 305 Minn. 160, 172, 232 N. W. 2d 879, 887 (1975), we said:

"The decision of the lower court on this issue was framed as a finding of fact. However, we view it as a conclusion of law drawn from uncontroverted facts."

We also quoted a footnote to Drope v. Missouri, 420 U. S. 162, 175, 95 S. Ct. 896, 905, 43 L. ed. 2d 103, 115 (1975):

" 'But "issue of fact" is a coat of many colors. It does not cover a conclusion drawn from uncontroverted happenings, when that conclusion incorporates standards of conduct or criteria for judgment which in themselves are decisive of constitutional rights. Such standards and criteria, measured against the requirements drawn from constitutional provisions, and their proper applications, are issues for this Court's adjudication * * *.' "

The trial court's decision appears to have been based in part on its finding that Peterson might not preserve the marsh in any event, and in part on its interpretation of Minn. St. 116B.04 as permitting it to exercise discretion in weighing various alternative routes. Therefore, this appeal raises two issues:

(1) Should the "family farm" exception in Minn. St. 116B.02, subd. 2, be construed so broadly as to allow the county to benefit derivatively from Peterson's immunity?

(2) Where a "feasible and prudent alternative" exists, may the court nevertheless authorize environmentally destructive conduct after weighing the alternatives?

With respect to the first issue, we think the broad construction of the family-farm exception advocated by the county, and apparently adopted by the trial court, would severely limit the effectiveness of the Act, to the extent that any environmentally

destructive activity would be permitted so long as the land is owned by or acquired from a farmer. The grantee would not be immune from suit, but the willingness of the grantor to convey an easement or a fee interest for development would in all cases rebut a prima facie case under the Act. Thus, the grantee would benefit derivatively from the farmer's immunity and the Act would be ineffective. We must presume that the legislature intended the Act to be effective. Minn. St. 645.17(2).

While our first opinion does indicate that a prima facie showing under the Act may be rebutted by evidence that the landowner is immune from suit, we continued that such rebuttal would only be relevant where the landowner could with immunity "act in a similar manner." 297 Minn. 229, 210 N. W. 2d 298. We now construe the family-farm exception to mean that the only conduct by a landowner which is immune from suit under the Act is farming or farm-related activity. It follows here that the possibility that Peterson might attempt to drain its marshland for farming purposes is not relevant where the county proposes highway construction which would adversely affect proximate marshland in a different manner.

Deprived of the derivative benefit of the family-farm exception, the county has not rebutted the prima facie case against it. In our first opinion, we concluded that construction of the highway over the route originally proposed would materially adversely affect the marsh. This conclusion was based on the following uncontroverted facts:

"* * * (1) The highway would divide a natural marsh; (2) the entire marsh is an ecological unit; (3) the construction would eliminate some of the area's natural physical assets; (4) the highway would be a relatively high-speed, high-volume roadway which would increase animal fatalities; and (5) the quietness and solitude of the marsh would be disturbed. In addition, there are the uncontroverted opinions of the expert witnesses that the highway would have a significant detrimental effect on the marsh." 297 Minn. 228, 210 N. W. 2d 297.

The county has not shown that the effect on the marsh will be less adverse if the highway is moved 50 feet to avoid the Bryson property. The second proposed route still bisects the marsh. Accordingly, given Bryson's unrebutted prima facie case, injunctive relief was appropriate unless the county established as an affirmative defense under Minn. St. 116B.04 that there was "no feasible and prudent alternative."

Turning then to the second issue presented by this appeal, we note that the affirmative defense under the Act is apparently derived from Federal environmental law. Section 4(f) of the Department of Transportation Act of 1966, as amended, 49 USCA, § 1653(f), provides that the Secretary of Transportation shall not approve acquisition of public parkland for construction of Federal-aid highways unless "there is no feasible and prudent alternative." In Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U. S. 402, 91 S. Ct. 814, 28 L. ed. 2d 136 (1971), respondents argued that "the requirement that there be no other 'prudent' route requires the Secretary to engage in a wide-ranging balancing of competing interests." 401 U. S. 411, 91 S. Ct. 821, 28 L. ed. 2d 150. The United States Supreme Court emphatically rejected this contention:

"But no such wide-ranging endeavor was intended. It is obvious that in most cases considerations of cost, directness of route, and community disruption will indicate that parkland should be used for highway construction whenever possible. * * *

"Congress clearly did not intend that cost and disruption of the community were to be ignored by the Secretary. But the very existence of the statutes indicates that protection of parkland was to be be given paramount importance. The few green havens that are public parks were not to be lost unless there were truly unusual factors present in a particular case or the cost of community disruption resulting from alternative routes reached extraordinary magnitudes. If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems." 401 U. S. 411, 91 S. Ct. 821, 28 L. ed. 2d 151.

The purpose and language of the Federal statute and our Act are substantially the same. Therefore, we follow the decision of the United States Supreme Court and give our statute a similar construction. The Dayton Co. v. Carpet, Linoleum, Etc. Union, 229 Minn. 87, 100, 39 N. W. 2d 183, 191 (1949).

As here applied, this construction means that, in the absence of unusual or extraordinary factors, the trial court must enjoin environmentally destructive conduct if a feasible and prudent alternative is shown. (It is, of course, the function of the trial court to consider these elements.)

Since such unusual or extraordinary factors have not been proved to exist, the route going to the west of the marsh is a feasible and prudent alternative. We do not think the possibility of shortened crop rows on the Peterson farm is a factor of unusual or extraordinary significance. Construction of a highway will require the taking of a comparable amount of land whether the land taken is farm or marsh. In the route originally proposed by the county, approximately 1.4 acres of marsh would have been taken. If the highway is rerouted onto agricultural land, the additional farmland needed will probably not exceed an acre. While it is true that portions of the Peterson farm would be bisected, causing some inconvenience to Peterson in farming operations, there is nothing in the record to indicate that Peterson would be foreclosed from farming the land on either side of the highway any more than Bryson, whose farm also will be divided by the proposed road to the north of the marsh, in any event, whether the county's proposal or the feasible and prudent alternative is followed.[2] The question of whether to build a high-

---

[2] The Bryson farm consists of three contiguous 40-acre squares forming the configuration of an inverted "L." 297 Minn. 220, 210 N. W. 2d 292. The southwest square is owned by Peterson and it is this square which would be traversed by the proposed highway. However, as the highway construction continued to the north, whether by the county's proposed route across the marsh or by the alternative route circumventing the marsh, the land taken from the northwest and northeast square would divide Bryson's farm.

way or not, of course, is a matter largely within the county's prerogative, but the location of that highway is now subject to the Environmental Rights Act.

The county is clearly a "person" against which injunctive relief is available, as that term is defined in Minn. St. 116B.02, subd. 2. Indeed, as a political subdivision of the state, the county has a greater duty than does a private individual to see that legislative policy is carried out. As a creature of the state deriving its sovereignty from the state, the county should play a leadership role in carrying out legislative policy.

Times change. Until the Act was passed, the holder of the power of eminent domain had in its hands almost a legislative fiat to construct a highway wherever it wished. In the 1920's and 1930's, the state encouraged highway construction to facilitate industrial expansion and transportation of farm products to market. However, a consequence of such construction has been the elimination or impairment of natural resources. Whether for highways or for numerous other reasons, including agriculture, it is a well-known fact that marshes have been drained almost indiscriminately over the past 50 years, greatly reducing their numbers. The remaining resources will not be destroyed so indiscriminately because the law has been drastically changed by the Act. Since the legislature has determined that this change is necessary, it is the duty of the courts to support the legislative goal of protecting our environmental resources.

In addition, we think the record adequately establishes that this particular marshland does have unique characteristics that the Act was intended to protect. An ecological unit in itself, it is also part of a larger drainage area several miles long, consisting of marshes, streams, and potholes, extending from the Peterson and Bryson farms north to Freeborn Lake. The marsh involved here contains waterfowl and upland game birds, both of which have greatly decreased in numbers in Minnesota during the past 10 or 15 years. In the same period, marshlands and other natural habitats have been greatly reduced.

To some of our citizens, a swamp or marshland is physically unattractive, an inconvenience to cross by foot and an obstacle to road construction or improvement. However, to an increasing number of our citizens who have become concerned enough about the vanishing wetlands to seek legislative relief, a swamp or marsh is a thing of beauty. To one who is willing to risk wet feet to walk through it, a marsh frequently contains a springy soft moss, vegetation of many varieties, and wildlife not normally seen on higher ground. It is quiet and peaceful—the most ancient of cathedrals—antedating the oldest of manmade structures. More than that, it acts as nature's sponge, holding heavy moisture to prevent flooding during heavy rainfalls and slowly releasing the moisture and maintaining the water tables during dry cycles. In short, marshes and swamps are something to protect and preserve.

A generation ago, the conservationist Aldo Leopold espoused a "land ethic" which he described as follows:

"All ethics so far evolved rest upon a single premise: that the individual is a member of a community of interdependent parts. His instincts prompt him to compete for his place in the community, but his ethics prompt him also to co-operate (perhaps in order that there may be a place to compete for).

"The land ethic simply enlarges the boundaries of the community to include soils, waters, plants, and animals, or collectively: the land.

\* \* \* \* \*

"In short, a land ethic changes the role of *Homo sapiens* from conqueror of the land-community to plain member and citizen of it. It implies respect for his fellow-members, and also respect for the community as such." *A Sand County Almanac* (1949) p. 203.

In the Environmental Rights Act, our state legislature has given this land ethic the force of law. Our construction of the Act gives effect to this broad remedial purpose.

Reversed and remanded with instructions to enter judgment for Bryson and intervenors in the manner sought in the state's motion for amended findings of fact, conclusions of law, and order for judgment.