STATE of Minnesota, by Arnold K. SKEIE and Jacqueline A. Skeie, Appellants,

v.

MINNKOTA POWER COOPERATIVE, INC., Respondent.

No. 48847.

Supreme Court of Minnesota.

June 15, 1979.

Thompson Nielsen Klaverkamp & James and Grant J. Merritt, Minneapolis, for appellants.

Cann Schmidt & Weddel and James W. Haskell, Bemidji, for respondent.

Heard, considered and decided by the court en banc.

SHERAN, Chief Justice.

This is the reconsideration of an appeal from the judgment of the Polk County District Court dismissing plaintiffs' action under Minn.St. 116B.03 to enjoin Minnkota Power Cooperative, Inc. (Minnkota) from constructing a power. line on a proposed route across plaintiffs' property. On May 16, 1978, this court restrained construction of the power line pending disposition of the

appeal. After consideration and decision without oral argument, on October 13, 1978, we issued a per curiam opinion affirming the dismissal. Plaintiffs petitioned for reconsideration, which was granted on October 26, 1978, by a special term panel of the court. The case was set for oral argument and heard by the court en banc on November 2, 1978. Once again, we affirm. Having had the benefit of oral presentations by the parties and further study of the issues, we direct that this opinion be substituted for the original, which is withdrawn.

In July, 1976, Minnkota began eminent domain proceedings to condemn property along the proposed route of a 230-kilovolt, high-voltage transmission line from a substation near Winger, Minnesota, to a new substation near Wilton, Minnesota. Construction of the line had begun in June, 1974; thus, the line was exempt from the requirements of the Minnesota Power Plant Siting Act, Minn.St. 116C.51, et seq., under the savings clause, § 116C.67. Only 13 of the 54 miles of line were not completed when these proceedings were begun.

The route proposed by Minnkota crossed land owned by plaintiffs and rented to a tenant farmer. Three double-pole towers were planned on the approximately five-eighths of a mile route across the Skeie property. The route crossed open farmland approximately 277 feet south of the farm building site.

Plaintiffs objected to the proposed route and brought an action under the Minnesota Environmental Rights Act, (MERA) Minn.St. c. 116B, to enjoin construction. They alleged that the line would destroy or impair a protectable natural resource, specifically, the productive agricultural use of the land. They further asserted that feasible and prudent alternative routes existed that would be less destructive. Their action was consolidated with the eminent domain proceedings for trial.

The trial court heard evidence that the proposed line would hamper the operation of farm machinery, make aerial spraying more hazardous, affect the installation of pivotal type irrigation, interfere with a proposed private landing strip and affect television reception, as well as evidence on five alternative routes, two considered and rejected by Minnkota and three offered by plaintiffs. Subsequently, the court granted Minnkota a perpetual easement along the proposed route and dismissed plaintiffs' claims under MERA.

Plaintiffs contend that the trial court erred in ruling that the productive use of farmland was not a natural resource protected by MERA and in giving inadequate consideration to feasible and prudent alternatives. Our original opinion held that plaintiffs had not established a prima facie case under MERA and, by implication, any consideration of alternatives was therefore not relevant. This conclusion follows from our view of MERA, of which further explanation may be in order.

The Minnesota Environmental Protection Act is intended to preserve the environment *in its natural state* from pollution, impairment or destruction. Minn.St. 116B.01 to 116B.13; *County of Freeborn v. Bryson*, 309 Minn. 178, 243 N.W.2d 316 (1976). To prevail in this case, it was necessary for the landowner to establish prima facie that the installation of the power line through his cultivated field was "likely to cause the pollution, impairment or destruction of the air, water, land or other natural resources located" on the premises involved. Minn.St. 116B.04. No attempt was made to make such a prima facie case unless it can be said that the presence of the line in and of itself constitutes "pollution, impairment or destruction" of the land. We do not think that the legislature so intended.

The evidence introduced by the landowner was limited to facts demonstrating that the *use* of his cultivated fields would be made *more difficult* because of the presence of the power line. No evidence was offered to show that the land would be polluted or impaired or destroyed in any specific way by the line or that the environment would be otherwise significantly adversely affected by its presence. If the landowner had introduced evidence to prove that the presence of the power line would have made the

soil sterile; or caused its erosion; or limited its cropping potential, in some significant, irreversible way, we would have a different situation. But this was not done. The missing evidence is that which distinguishes intrusion upon land which cannot be compensated by damages from those which can. The distinction is a critical one.[1] *No Power Line v. Minn. Environmental Quality*, 262 N.W.2d 312 (Minn.1977).

Since the appellant failed to make a prima facie case of entitlement to the protection of the MERA, the trial court was not free to evaluate alternative routes. Minn.St. 116B.04, ¶ 2.

Were we to hold that intrusion upon "land" or "soil" which makes its *cultivation and use more difficult* constitutes a prima facie case of pollution, impairment or destruction of the environment, MERA would be extended beyond the scope which the legislature intended. Whether such an extension is a good thing or not is something that the legislature, rather than this court, should decide. This consideration is of special significance in dealing with environmental legislation which so much involves the weighing of considerations of public policy—a role best performed by the elected representatives of the people. The legislature, when it adopted the MERA, authorized "any person" to challenge any use of land (except by a family farmer for farm-related activity) which, in his perception, adversely affects natural resources. This new power which the legislature has created should not be extended into areas where its use was not clearly intended.[2]

Affirmed.

1. In addition to the disruption of farming operations, which was the thrust of the landowner's complaint, there is evidence in the record that the power line will have certain minor impacts on the natural environment itself. Respondent's Exhibit Z and Finding of Fact No. 5 of the trial court. The landowner contends that in rejecting his prima facie case we have considered only disruption of farming operations to the neglect of these other impacts. In this regard, we note the requirement of Minn.St. 116B.02, subd. 5, that the adverse impact complained of must be material. Whether because the anticipated impacts here fail to meet this requirement or because the placement of this power line in any alternative location would

OTIS, Justice (concurring specially).

I share the misgivings of Mr. Justice Yetka and agree that respondent has shown little sensitivity or attention to the legitimate concerns of this property owner by not finding practical alternatives to the route chosen. The result seems to be not only a calloused disregard of the human factors in imposing an unwanted and uninvited intrusion on the owners' land, but an unnecessary economic burden on those who will ultimately compensate the owner for damages which could have been mitigated. Nevertheless I agree with the majority that however poor the judgment of respondent may have been, it had a right under the statute to proceed as it did.

SCOTT, Justice.

I agree with the special concurrence of Mr. Justice Otis.

YETKA, Justice (dissenting).

I dissent. This case was originally decided without the benefit of oral argument. After oral arguments were held, I became convinced that our initial opinion was a mistake and am even more certain that the majority opinion, likewise, does not properly interpret the M.E.R.A.

The purpose behind M.E.R.A. is to protect for each person the "air, water, *land*, and other natural resources located within the state." Minn.St. 116B.01. (Italics supplied.) "Natural resources"[1] is further

result in similar adverse impacts, we are not persuaded that the trial court's ruling on this point is clearly erroneous.

2. We note that in the Power Plant Siting Act, Minn.St. 116C.51, et seq., from which this power line is exempt, the legislature established procedures and standards for considering effects on farming and determining a suitable route.

1. Minn.St. 116B.02, subd. 4, defines this term as: "Natural resources shall include, but not be limited to, all mineral, animal, botanical, air, water, land, timber, soil, quietude, recreational and historical resources. Scenic and esthetic

defined to include such things as "air, water, *land*, timber, [and] *soil.*" 116B.02, subd. 4. (Italics supplied.) M.E.R.A. seeks to protect natural resources from pollution, impairment, or destruction. 116B.01. Through the Act, the legislature has manifestly sought "to create and maintain within the state conditions under which man and nature can exist in productive harmony in order that present and future generations may enjoy clean air and water, productive land, and other natural resources with which this state has been endowed." 116B.01. It is clear that the intent underlying this legislation is that the environment in its natural state should be preserved wherever it is reasonable to do so. In *County of Freeborn by Tuveson v. Bryson*, 309 Minn. 178, 243 N.W.2d 316 (1976), this court held that a proposed highway had to be rerouted through farmland in order to protect a natural marshland. Minn.St. 116B.02 allows farmers to cultivate their land, thus impairing or destroying its natural state, without being susceptible to prosecution under the Act. Thus, under both M.E.R.A. and caselaw, it can be argued farming is not a protected natural resource.

The analysis cannot stop at this conclusion, however, for the statute also protects "productive land." 116B.01. This term is meaningful only when read in conjunction with the family farm provision. Together they are interpreted to mean that land in its natural state is protected, but when it is used for farming, consideration must then be given to preserving and protecting its use to that end.[2] By enacting the family farm exception, the legislature displayed a desire not only to exempt farming from the sanctions of M.E.R.A., but also to encourage maximization of productivity.

This analysis does not mean that where land is used for farming it merits deference equal to that of the traditionally-recognized natural resources.[3] It does not. When productive farmlands are compared with natural resources, the latter should typically receive protection, absent unusual and extraordinary circumstances.[4] If farmland and marshes, wetlands, or lakes were all on equal footing, then, in this state, productivity of farmland would likely be given greater priority by most courts. This was not the intent behind M.E.R.A. Farming is not a natural resource, so the maximization of productivity consideration arises only with respect to comparing two pieces of productive farmland.

In the instant case, plaintiffs objected to the proposed route and brought an action under Minn.St. c. 116B to enjoin construction. They alleged that the line would de-

---

resources shall also be considered natural resources when owned by any governmental unit or agency."

**2.** When farmland is compared with other farmland, it is necessary to determine which location maximizes its use for farming. Of course, other factors which M.E.R.A. seeks to preserve, such as quietude, aesthetics, animals, and so forth must also be weighed. "Productive land" within the intendment of the statute does not extend equally to nonfarming uses of land. If two pieces of commercial property are sites for a proposed change, the use of the land which comports more with the purposes and goals of M.E.R.A. should be protected. "Productive" maximization of commercial, nonfarmland is not relevant under such circumstances because economic considerations alone are not a factor to be considered. 116B.04. In such cases, there must be a balancing of the utility of the technological advancement against the gravity of the harm to interests sought to be protected by M.E.R.A. *M. P. I. R. G. v. White Bear Rod & Gun·Club*, 257 N.W.2d 762 (Minn.1977);

*County of Freeborn v. Bryson*, 297 Minn. 218, 210 N.W.2d 290 (1973).

**3.** The statute has been construed broadly to effectuate its purpose of protecting the environment. It has been used to protect a lake used for recreation and as a natural flyway and brook area for wild fowl and a virgin oak woods, *People for Environmental v. Minn. Environmental*, 266 N.W.2d 858 (Minn.1978); quietude and wetlands, *M. P. I. R. G. v. White Bear Rod & Gun Club, supra*; lakes, *In re Application of City of White Bear Lake*, Minn., 247 N.W.2d 901 (1976); *Corwine v. Crow Wing County*, 309 Minn. 345, 244 N.W.2d 482 (1976); and a natural wildlife marsh, *County of Freeborn by Tuveson v. Bryson*, 309 Minn. 178, 243 N.W.2d 316 (1976); *County of Freeborn v. Bryson, supra*.

**4.** See, *M. P. I. R. G. v. White Bear Rod & Gun Club, supra*; *County of Freeborn by Tuveson v. Bryson*, 297 Minn. 218, 210 N.W.2d 290 (1973).

stroy or impair a protectable natural resource, specifically, the productive agricultural use of the land. They further asserted that feasible and prudent alternative routes existed that would be less destructive. Their action was consolidated with the eminent domain proceedings for trial.

A number of alternative proposals were advanced. Defendant examined two others: one 6 miles north of the proposed site, the other 6 miles south. Defendant concluded these are not feasible and prudent alternatives because they would have crossed a state forest and lakes and wetlands, respectively.

Plaintiff Skeie offered three possible alternatives. Under the first, and the one that Mr. Gauger, civil engineer for Ulteig, felt was the best of the three, the powerline would be placed in the ditch on or near the present right-of-way on the northern boundary of plaintiff's property. Of the three proposals, this appears to be the most viable.

Mr. Gauger criticized the first proposal, and the others, for several reasons, as not being feasible and prudent. The reasons were primarily due to the detrimental effects on birds, the increased dimensions and impact of larger single poles, and the aesthetic impact. However, the evidence was less than conclusive. There appears to be a real dispute as to the effect of the higher lines on birds, even assuming higher lines would be required—a fact not proven. In this respect, no evidence was presented as to the kinds of birds, flight patterns, etc. which would be adversely affected. Although the single poles would be taller, with broader bases (double poles: 75 feet tall, 3 feet diameter, and 11 to 14 feet deep; single poles: 125 feet tall, 10 feet diameter, 25 to 30 feet deep), there would be no increased long-term impact due to the larger size of the footings. By placing the poles along the township road, the power company would utilize an already existing right-of-way instead of taking additional land from Mr. Skeie. Furthermore, although the public might be somewhat less able to see the lines if they were located in the field, if the lines were placed near the present lines the visual impact would be reduced because the public is already accustomed to the presence of the lines near the township road. Additionally, as was pointed out in *No Power Line v. Minn. Environmental Quality*, 262 N.W.2d 312, 333 (Minn. 1977):

> "The more the public generally is exposed to what is being done to our environment, the better they will be able to participate in the decision-making process of determining whether or not they wish to pay the cost—both in dollars and in destruction to the environment * * *."

(Yetka, J., concurring specially).

And, from a practical standpoint, it would be easier for Mr. Skeie to farm and maneuver his equipment in his field if the powerlines were near the township road. He would thus maximize the use of his land.

In arguing that no feasible and prudent alternative exists, defendant also stressed this court's language in *People for Environmental v. Minn. Environmental*, 266 N.W.2d 858 (Minn.1978). But in that opinion we said (266 N.W.2d 873):

> "* * * Implicit in the operation of MERA is the principle that environmentally damaging action cannot be taken if there is another, *less damaging* way to achieve the desired result. In order to protect Minnesota's noncompensable resources, whose impairment appears to harm no one directly, MERA makes a prima facie showing of environmental damage by any concerned citizen or group sufficient to shift the burden to the proponents of the action to establish that there is no prudent and feasible alternative which will be *less destructive* to the environment." (Italics supplied.)

In determining whether a feasible and prudent alternative exists, this court has said that there must be unusual factors precluding the alternative routes. Thus, in *County of Freeborn by Tuveson v. Bryson, supra*, this court held that an alternative route which avoided a natural marshland was a prudent and feasible alternative despite the resulting inconvenience to farming. In

*People for Environmental v. Minn. Environmental, supra,* this court held that the taking of seven or eight homes was not an extraordinary disruption sufficient to justify proliferation of high-voltage powerlines and the destruction of natural resources. Under this analysis, it does not appear that defendant has maintained its burden of proof.

Thus, I would hold that the productive use of land in farming should be considered and M.E.R.A. may be invoked when alternate farmland sites are compared for the placement of the high-voltage lines. If a farmer shows that a less destructive farmland site for a powerline exists, then the burden of proof is on the condemnor to show that that proposed site is not a reasonable and prudent alternative. Mr. Skeie has shown that putting the lines in his field would diminish the productive use of the land more than would placing the lines in or near the existing right-of-way. On the basis of the evidence presented, I am not convinced that defendant has met its burden to show that the use of existing town roadway rights-of-way are not feasible and prudent. Equally important, since this project was commenced, both the state and federal governments have, by legislative action, clearly authorized road rights-of-way to be used.[5] The Minnesota statute specifically provides that "[e]valuation of potential routes which would use or parallel existing railroad and *highway rights-of-way"* be a consideration and guide for the Minnesota Environmental Quality Board in its designation of sites and routes for powerlines. (Italics supplied.) This is further reason for our reconsidering the case and for additional inquiry into the possibility of alternate sites.

The simple fact is that this case poses a situation where the condemnor did not consider the interests of these property owners at all in selecting its route. It operated in the time-worn method of selecting a route prior to the passage of the M.E.R.A.: if it is the shortest and cheapest way, you use it without regard to the hardships imposed.

I do not believe the M.E.R.A. was intended to be interpreted in such a way and I would thus reverse and remand for selection of the clearly prudent and alternative route available.

---

5. L.1977, c. 439, § 116C.57, subd. 4(8); Power Plant Siting Act, P.L. 95–599, § 113, 92 Stat. 2696.