In the Matter of the Application of Allard CHRISTENSON for a Permit to Drain Wetland 47–219 in Sections 6 and 7, Township 121 North, Range 32 West, Meeker County and Sections 1 and 12, Township 121 North, Range 33 West, Kandiyohi County, Minnesota.

No. C5–86–332.

Supreme Court of Minnesota.

Dec. 24, 1987.

Gregory A. Fontaine, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Gail I. Lewellan, Sp. Asst., St. Paul, for respondent.

## OPINION

WAHL, Justice.

This case arises under Minnesota's public waters and wetlands legislation, Minn.Stat. § 105.39 (1986), 105.391 (1986) and related statutes, and concerns the denial of a permit to drain a protected wetland. Allard Christenson is requesting this court's review of a court of appeals' decision affirming the Department of Natural Resources (hereinafter, DNR) order rejecting his application to drain wetland 47–219 located on his 360–acre farm.[1] We affirm the decision of the court of appeals and order of the commissioner denying the permit.

The Minnesota State Legislature, in 1976, and again in 1979, mandated an inventory of the state's public waters, and delegated the responsibility for classifying the state's waterbodies as public, wetland or neither to the Department of Natural Resources. 1976 Minn.Laws ch. 83 § 8 as amended by 1979 Minn. Laws, ch. 199 § 7

(codified as Minn.Stat. § 105.39 and related statutes.) Prior to 1976, there had been no systematic inventory of the state's waterbodies, and classification of waterbodies was made on a case-by-case basis. This ad hoc approach to regulation resulted in uncertainty, unknowing violations, and costly and time-consuming litigation.

The purpose of the mandated inventory was to identify, count, list and map the state's waterbodies according to specific statutory standards. The DNR began the process in 1976 and to the date of the hearing had completed notice and hearing procedures in all 87 counties. Over the last 11 years approximately 29,000 lakes, rivers and wetlands comprising nearly five million acres have been inventoried. Appeals regarding 24 of those waterbodies remain undecided. Christenson's appeal concerns an 80–acre, type 3 wetland located on his farm and identified as wetland 47–219.[2] The identification of this waterbody as a wetland is undisputed.

Allard Christenson, a resident of Mahnomen County, owns a 360–acre farm located in Meeker and Kandiyohi Counties. The farm was acquired by Christenson's great grandfather, Ole Christenson, in 1877. Allard was given a one-half interest by his father in 1975 and bought the other half interest from his uncle in 1983.

In 1914, Christenson's grandfather, Martin Christenson, constructed drainage ditches in the low areas of the farm. The depth of these ditches was estimated to be three to four feet and their top width eight to nine feet, but the exact dimensions are unknown. No repairs or improvements have been made in these ditches since their original construction. A plan to repair the ditches in 1964 was abandoned. Christenson's father and uncle farmed the land until the mid–70's, when, because of their advanced ages, they leased the property to

1. The court of appeals, being equally divided, affirmed the commissioner's order without published opinion.

2. Minn.Stat. § 105.37, subd. 15, provides: "Wetlands" includes, and shall be limited to all types 3, 4, and 5 wetlands as defined in the United

States Fish & Wildlife Service Circular No. 39 (1971 edition), not included within the definition of public waters, which are ten or more acres in size in unincorporated areas or 2½ or more acres in incorporated areas.

a neighbor who did not use the disputed wetland portion of the property.

In 1984, Christenson applied for a drainage permit to excavate vegetation and debris from the ditches, which were in Meeker County, and enlarge them to a top width of 20 feet and a depth of four to five feet. The permit was denied, and pursuant to Minn.Stat. § 105.44, a contested case hearing was held. At the hearing, the administrative law judge determined that ditches of the size proposed by Christenson would substantially drain the wetland, reducing it from a type 3 to an area not protected under current state law. Her recommendation to deny the permit was adopted by the commissioner on January 17, 1986. Christenson was offered, but rejected, compensation through the state water bank program.[3]

The case raises two major issues: whether Minn.Stat. § 105.391, subd. 1 (1986), which provides for published notice of the inventory and mapping of the state's wetlands and public waters, is constitutionally valid on its face and as applied to the petitioner under the United States and Minnesota Constitutions; and whether the reservation of "existing rights" contained in Minn.Stat. § 105.38(1) (1986) allows petitioner to enlarge or rebuild private drainage ditches and drain a protected wetland.

## I

We recall at the outset that the state, through its police power, has been defining and protecting its public water resources since 1867. 1867 Minn.Laws, c. 40. Our research also makes clear that the state's regulatory authority over public waters

and wetlands is independent from the inventory process which gave rise to the case before us. Although the statutory definition of public waters has changed over the last 90 years,[4] the state's authority to regulate and control such waters has been a constant since at least 1937. In that year, the legislature assigned to the Commissioner of Conservation (now the Department of Natural Resources) the task of supervising a permit system for the use and appropriation of the state's waters, thereby conserving this valuable resource. 1937 Minn. Laws, ch. 468. Further, this court has considered and repeatedly affirmed the legitimacy of the state's regulatory authority over the state's waterbodies. *See, e.g. State v. Kuluvar,* 266 Minn. 408, 123 N.W. 2d 699 (1963); *State v. Sheriff,* 296 Minn. 177, 207 N.W.2d 358 (1973); *State, Dept. of Natural Resources v. Olson,* 275 N.W.2d 585 (Minn.1979); *Crookston Cattle v. Minn. Dept. of Natural Resources,* 300 N.W.2d 769 (Minn.1981).

Although the legislature has expanded the list of waters to be placed under state regulation and control over the years, it has, at the same time, moved toward increasingly specific criteria for protected waterbodies, presumedly to eliminate the uncertainty resulting from the earlier, more ambiguous definitions. Nevertheless, there had not been a systematic inventory of all waterbodies under state regulation prior to 1976, and public waters determinations were made by the DNR or the courts on an ad hoc basis, as noted previously. In 1976, and again in 1979, the legislature mandated such an inventory. 1976 Minn.Laws c. 83, § 8; 1979 Minn. Laws c. 199, § 7. It is obvious, however,

---

**3.** Minn.Stat. § 105.391, subd. 3, provides that: "no public waters or wetlands shall be drained, and no permit authorizing drainage of public waters or wetlands shall be issued * * *" The only statutory exceptions to this prohibition occur where (1) designated public waters or wetlands are replaced by public waters or wetlands having equal or greater public value, or (2) where the commissioner fails to make water bank compensation available to the landowner. In the case of wetlands situated on privately owned lands, an owner may apply to the commissioner for a permit to drain a designated wetland after the expiration of ten years following the original designation. Further, a land-

owner cannot be prevented from using a wetland or public water bed for pasture or cropland during periods of drought. Minn.Stat. 105.391, subd. 10. Finally, designation of waters as either public waters or wetlands does not grant to the public any greater right of access. Minn.Stat. 105.391, subd. 12.

**4.** See 1897 Minn.Laws, c. 257 § 1; 1937 Minn. Laws, c. 468 § 1; 1947 Minn.Laws, c. 142 § 2; 1957 Minn.Laws, c. 502 § 1; 1973 Minn.Laws, c. 315 § 4, 1976 Minn.Laws, c. 83 § 7; 1979 Minn. Laws, c. 199 § 2.

that there has been no departure from the policy of state control declared by the legislature 50 years ago. The permit system has been preserved since its inception in 1937, and nowhere in either the 1976 or 1979 statutes is the state's jurisdiction over public waters made dependent on completion of the inventory.

## II

■ The first issue is whether Minn. Stat. § 105.391, subd. 1, which provides for published notice of the inventory and mapping of the state's wetlands and public waters, is constitutionally valid on its face and as applied to Allard Christenson. Christenson argues that the published notice required by the statute is inadequate to protect his due process rights under the United States and Minnesota constitutions and that, even if constitutional on its face, it was unconstitutionally applied to him. The state responds that the public waters inventory effects a legislative classification which does not require personal notice and, beyond that, it does not deprive Christenson of property rights protected by the due process clause of the constitution.

■ In deciding this issue, we are guided by the principle that a statute is construed to uphold its constitutionality and effect the intent of the legislature if possible. *See Housing and Redevelopment Authority v. Greenman*, 255 Minn. 396, 403, 96 N.W.2d 673, 678 (1959). We will exercise the power of this court to declare a law unconstitutional only when absolutely necessary and then with great caution. *Id.*

Minn.Stat. § 105.391, subd. 1, describing the procedures to be followed in the inventory process, reads as follows:

**105.391. Waters inventory and classification**

Subdivision 1. On the basis of all information available to the commissioner and the criteria set forth in section 105.-37, subdivisions 14 and 15, the commissioner shall inventory the waters of each county and make a preliminary designation as to which constitute public waters and wetlands. The commissioner shall send a list and map of the waters prelimi-

narily designated as public waters and wetlands in each county to the county board of that county for its review and comment. The county board shall conduct at least one public informational meeting within the county regarding the commissioner's preliminary designation. After conducting the meetings and within 90 days after receipt of the list or maps, the county board shall present its recommendation to the commissioner, listing any waters regarding which the board disagrees with the commissioner's preliminary designation and stating with particularity the waters involved and the reasons for disagreement. The commissioner shall review the county board's response and, if in agreement with any of the board's recommendations, shall revise the list and map to reflect the recommendations. Within 30 days after receiving the county board's recommendations, the commissioner shall also notify the county board as to which recommendations are accepted and rejected and the reasons for the decision. After the revision of the map and list, if any, or if no response is received from the county board within the 90 days review period, the commissioner shall file the revised list and map with the recorder of each county and shall cause the list and map to be published in the official newspaper of the county. The published notice shall also state that any person or any county may challenge the designation of specific waters as public waters or wetlands or may request the designation of additional waters as public waters or wetlands, by filing a petition for a hearing with the commissioner within 90 days following the date of publication. The petition shall state with particularity the waters for which the commissioner's designation is disputed and shall set forth the reasons for disputing the designation. If any designations are disputed by petition, the commissioner shall order a public hearing to be held within the county within 60 days following the 90 day period, notice of which shall be published in the state register and the official newspaper of the county. The hearings shall

be conducted by a hearings unit composed of one person appointed by the affected county board, one person appointed by the commissioner and one board member of the local soil and water conservation district or districts within the county who shall be selected by the other two members at least 20 days prior to the hearing date. * * * Within 60 days following completion of the hearing, the hearings unit shall issue its findings of fact, conclusions and an order, which shall be considered the decision of an agency in a contested case for purposes of judicial review pursuant to sections 14.63 to 14.69. The commissioner, the county or any person aggrieved by the decision of the hearings unit may appeal from the hearings unit's order. Upon receipt of the order of the hearings unit and after the appeal period has expired, or upon receipt of the final order of the court in the case of an appeal, the commissioner shall pulish a list of the waters determined to be public waters and wetlands. The commissioner shall complete the public waters and wetlands inventory by December 31, 1982.

The DNR began this inventory process in Meeker County in 1979. A preliminary list of designated public waters and wetlands was sent to the county board on December 19, 1979. A public information meeting was held on March 14, 1980. The 80–acre site located on the Christenson farm, designated as wetland 47–219, was inspected on April 22, 1980, and identified as a Type 3 wetland.

A map and list of designated wetlands was published in the *Litchfield Independent Review* on June 25, 1980. Notice also appeared in the *Eden Valley Journal, The Cosmos Sun, The Dassel Dispatch,* and *The Watkins Patriot.* Publication preceded the 90 day petition period during which any person or county could challenge the proposed designations or request additional designations. Fifteen petitions were received and a hearing convened on November 17, 1980. The petition period was then extended to December 15, 1980. The designation of wetland 47–219 was not challenged during either the first or second petition periods. Christenson learned of the designation in 1982.

■ In analyzing Christenson's challenge to the statute, we must ask how much process is due in the making of a public waters inventory. The rule is that "the requirements of due process must be measured according to the nature of the government function involved and whether or not interests are directly affected by the government action." *Barton Contracting Company, Inc., v. City of Afton,* 268 N.W. 2d 712, 715 (Minn.1978). When a municipal governing body is taking an action which will affect "an open class of individuals, interests, or situations," that governing body is acting in a legislative capacity, and any rights of procedural due process in such proceedings are minimal. *Id.* at 715.

*Barton Contracting* concerned zoning decisions, but there is an obvious parallel between the public waters inventory and the establishment of zoning laws. Both processes classify and restrict uses; both result in maps identifying classifications; both provide for later hearings when landowners apply for a different use. In the waterbody inventory process, the only concern is the character of the water, not the owner or the owner's activities. The only issue is whether the waterbody meets certain statutory criteria. Furthermore, numerous state and local proceedings which have substantial effects on private land ownership and use depend on published notice only: e.g. waters inventory mandated by pollution control legislation, Minn. Stat. § 115.44; wild and scenic rivers designations, Minn.Stat. §§ 104.31–.40 (1986); as well as water inventory proceedings in other states, e.g. Mich.Stat. § 281.719 (1986).

Contrary to Christenson's assertion, cases from this court and the United States Supreme Court do not establish that the published notice provided by § 105.391, subd. 1 is inadequate. In fact, the very cases cited by Christenson for that proposition, acknowledge that the notice required by due process will vary with the circumstances and conditions of each case, making it "impossible to draw a standard set of

specifications as to what is constitutionally adequate notice, to be mechanically applied in every situation." *Schroeder v. City of New York*, 371 U.S. 208, 212, 83 S.Ct. 279, 282, 9 L.Ed.2d 255 (1962). In an earlier case, the Supreme Court reasoned that where the state interest is strong, "impossible or impractical obstacles" cannot be justified. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

In cases where statutory schemes for notice have been struck under due process requirements, courts were either reacting to the extent of forfeiture or deprivation exacted on the parties or focusing on the quality of notice actually provided under the facts of the case. In *Schroeder*, the city instituted proceedings to condemn rights, affecting Schroeder's property, required for the city's water system. Noting that appellant's home was a summer cottage, the Supreme Court held that published notice in a local newspaper during the month of January was not adequate. The Court also observed that posted notices did not appear anywhere on appellant's property nor did publications appear in newspapers serving the towns nearest appellant's property. In *Mullane*, where a trust company followed statutory notice procedures in its petition for a judicial settlement of accounts which might, or did, deprive beneficiaries of property, the Court held that published notice was sufficient as to any beneficiary whose interest or address was unknown to the trustee. However, such notice was not sufficient for those beneficiaries whose whereabouts were known. Under the facts of that case, a history of correspondence had been established with these latter beneficiaries; i.e., income had occasionally been remitted to them and notices of investments had also been made. But the Court acknowledged that "in the case of persons missing or unknown, employment of an indirect and probably even futile means of notification is all that the situation permits and creates no constitutional bar * * * " *Mullane*, 339 U.S. at 317, 70 S.Ct. at 658 (cites omitted).

This court, too has been concerned with the nature of the deprivation when faced by a due process challenge to adequacy of notice. Where a special assessment is to be levied against property for a sanitary sewer improvement, published notice of the assessment hearing does not comport with due process requirements. *Meadowbrook Manor, Inc. v. City of St. Louis Park*, 258 Minn. 266, 104 N.W.2d 540 (1960). The property owner in *Meadowbrook Manor* had no actual notice of the assessment for the sanitary improvement made more than two miles distant from its property until it received a statement for the assessment from the county treasurer. Under those facts, we determined that mailed notice, rather than published notice, of the special assessment hearing was the notice "reasonably calculated" to inform the property owner before its property could be subjected to the lien of a special assessment. 104 N.W.2d at 545. Similarly, where forfeiture to the state of an owner's severed mineral interest could occur without an opportunity for a hearing, we held the published notice provision of the Mineral Registration Act to be in violation of due process. *Contos v. Herbst*, 278 N.W.2d 732 (Minn.1979). "[N]otice by publication is inadequate," we concluded, "where forfeiture is the penalty imposed for mere failure to act." 278 N.W.2d at 743.

Christenson's case is a far cry from *Meadowbrook Manor* and *Contos*. Identification of Christenson's waterbody as a wetland under the public waters inventory does not affect either his ownership interest in the property or the public's access to it. Minn.Stat. § 105.391, subd. 12. Nor does that identification exact an undue financial penalty.

Personal notice is not required unless the interested party may otherwise lose a protected property right. Nor is personal notice required when the giving of such notice is not reasonably possible. *Walker v. City of Hutchinson*, 352 U.S. 112, 115, 77 S.Ct. 200, 202, 1 L.Ed.2d 178.

To provide personal notice to all interested persons in the public water inventory

process throughout the state would be a nearly impossible administrative task. Approximately 29,000 waterbodies were inventoried. The larger of these bodies have hundreds of riparian owners. The task of comparing public water maps with land records to determine owners and addresses could not possibly have been done in advance of the inventory process. It is clear to this court, as it was clear to the legislature, that an inventory process that stayed classification until every interested party received personal notice could result in wetlands being drained, ditched, and cropped prematurely. A statutory notice provision that would in any way delay formal designation of these waterbodies could jeopardize the protection of this natural resource whose value we recognized and endorsed in *County of Freeborn v. Bryson*, 309 Minn. 178, 243 N.W.2d 316 (1976).

The statutory notice scheme provided by Minn.Stat. § 105.391, subd. 1, incorporates many procedural safeguards to prevent erroneous designation: review by the county, information meetings, publication, public hearings and further published notices. In fact, in Christenson's case, actual procedures exceeded the statutory minimum. Publication of Meeker County's notice of a map and list appeared not only in the official county newspaper but also in all four other county newspapers. Meeker County's notice and map covered 2½ pages with dimensions of 14 inches by 22 inches, certainly adequate to dispel the *Mullane* Court's concern for "small type in the back pages of a newspaper." *Mullane*, 339 U.S. at 315, 70 S.Ct. at 658. Further, the inventory hearing unit allowed two, rather than one, petition periods in Meeker County.

We hold that Minn.Stat. § 105.391, subd. 1, which provides for published notice of the inventory and mapping of the state's wetlands and public waters is constitutionally valid on its face.

Christenson, however, also challenges the constitutionality of § 105.391, subd. 1 as it was applied in the designation of his wetland. He claims that because a small part of wetland 47–219 extends from Meeker County into Kandiyohi County, the DNR's failure to publish notice of inventory proceedings in Kandiyohi County newspapers violates due process. We find no merit in this argument. Christenson applied for permission to drain only the Meeker County wetland. The ALJ found that both portions could be drained independently. Although Christenson stated that clean-out of the Meeker County ditches would divert water from both portions, a close reading of his permit application reveals that his primary intention was to restore the pasture land, which according to testimony at the hearing, was located in Meeker County. Finally, there is no dispute that statutory procedures were followed in Meeker County and that a wetland exists. Thus, omission of publication in Kandiyohi County was, at most, a technical error which did not lead to an erroneous designation. We hold Minn.Stat. § 105.391, subd. 1, constitutional as applied.

### III

The final issue for our determination is whether the reservation of "existing rights" contained in Minn.Stat. § 105.38(1) allows Christenson to enlarge or rebuild private drainage ditches and drain a protected wetland. He asserts that because the wetland was drained at some time in the past, he has an existing right under the statute to drain. The state maintains that no existing rights are infringed since riparian rights are protected and existing uses may continue. We agree with the state.

Section 105.38(1) provides, *"Subject to existing rights* all public waters and wetlands are subject to the control of the state."* (Emphasis added.) We have construed "subject to existing rights" to mean "subject to existing riparian rights." *Pratt v. State*, 309 N.W.2d 767, 772 (Minn. 1981). In order to harvest wild rice, Pratt acquired three waterbodies which were subsequently declared public waters. He argued that his previous ownership of these waterbodies established an existing right to harvest using a mechanical picker, a more profitable method of harvesting than hand flailing. In determining that

Pratt had riparian rights to grow and harvest wild rice, this court stated:

> \* \* \* One may have rights to the use and enjoyment of the water, rights exclusive of the general public, through ownership of lakeshore or lakebed. These rights the law calls riparian. *One does not own the water; one owns riparian rights to the use and enjoyment of the water.* (emphasis added). *Id.* at 772.

Riparian rights are not restricted only to navigable waters. *Johnson v. Seifert,* 257 Minn. 159, 166, 100 N.W.2d 689, 695 (1960). Like other states having extensive recreational or commercial water resources, Minnesota upholds riparian rights without distinction between navigable and non-navigable, meandered or unmeandered, or public or private waters. Further, these rights are applicable to all waters which are subject to the protection and control of the state, including wetlands. *See, In the Matter of the Application of the Central Baptist Theological Seminary,* 370 N.W.2d 642, 646 (Minn.App.1985).

Typical riparian activities include hunting, fishing, boating, sailing, and other domestic or recreational uses. *Johnson v. Seifert,* 100 N.W.2d 689, 697. While existing rights are not absolutely restricted to these enumerated riparian activities, Christensen's proposed drainage project does not fit any definition of existing riparian rights. He proposes not to use and enjoy the water, but to drain it, eliminating not only his riparian rights, but also the rights of any one who even remotely or indirectly benefits from the continued existence of this wetland. His activity would impair and destroy a protected wetland.

Drainage of wetland 47–219 would result in the loss of a significant wildlife habitat, and the administrative law judge so found. The wetland serves as habitat for both resident and migratory wildlife. It provides food, cover and resting areas for weasel, mink, muskrat, pheasant, fox, rabbit, hare, deer, a variety of song birds, rails and raptors. Approximately 60 muskrat houses were observed in the area in 1984. Although none of the wildlife identified above were threatened or endangered at the time of the hearing, they were, with the exception of weasel, "protected" within the meaning of Minn.Stat. § 97.40, subd. 6 (1984).[5]

In addition, water from wetland 47–219 flows through a channel to Lake Koronis, approximately two miles downstream. A delta has formed where the channel from this wetland enters the lake. Currently, Lake Koronis is experiencing serious water quality problems related to sedimentation and nutrients from agricultural run-off. Christenson's drainage project would have a negative effect on the water quality of Lake Koronis, since it would eliminate the wetlands' natural filtering system and add to the untreated nutrient and sediment-laden water flowing into Lake Koronis.

Christenson contends that his existing right to drain is also protected under the non-conforming use doctrine. This doctrine recognizes that when a land use lawfully exists prior to the enactment of a restricting government regulation, the landowner has a right to continue the use after the regulation comes into effect. *County of Freeborn v. Claussen,* 295 Minn. 96, 203 N.W.2d 323 (1972). He claims that because the ditches were first dug in 1914, 66 years before the DNR designated 47–219 as a protected wetland, the ditches were both pre-existing and lawful. As such, his right as a property owner to maintain this private drainage system is protected.

While this argument might be appropriate in some circumstances, its applicability here is limited by the actual facts. The record shows that while the ditches were originally constructed around 1914, no subsequent maintenance occurred. The 1938 aerial photographs indicated a wetland area of approximately 85.2 acres. According to stereoscopic photographic analysis, later photos (1950–1979) taken by the U.S. Agricultural Stabilization and Conservation Services (ASCS) confirmed wetland acreage approximately 79.7 through 84.5 acres. These photos, taken at random times

---

5. We note that this statute was subsequently repealed. 1986 Minn.Laws, c. 386, art. 4, § 33.

throughout those years (e.g. September, May, June), revealed no evidence of ditch cleanout or maintenance.

The wetland itself has not been used since its rental to neighboring farmers in the mid–1970's. The administrative law judge found that the wetland was not of recent origin nor the result of recent human activities in the area. A series of aerial photographs showed aquatic vegetation and persistent saturation of the soil from at least 1938 to the time of the hearing. In addition, United States Soil Conservation Service Maps showed evidence of palms soil, a typical wetland soil, described as "a very poorly drained, neutral soil formed in a very friable, shallow, highly decomposed plant material. It occupies old lakes, marshes and potholes on glacial moraines. * * * " Administrative Law Judge, Findings of Fact, Conclusions and Recommendations. August 23, 1985. The wetland was never plowed or planted in row crops, but was used occasionally for hay crops and regular grazing during dry years, a use not inconsistent with a wetland determination. We find no non-conforming use which must be protected beyond preventing the state from requiring Christenson to either destroy or fill in what is left of his drainage system.

We hold that the reservation of existing rights contained in Minn.Stat. § 105.38(1) does not allow Christenson to enlarge or rebuild private drainage ditches and drain a protected wetland.

Over ten years ago this court cited the conservationist Aldo Leopold for his espousal of a "land ethic" which envisions a community of interdependent parts. "The land ethic simply enlarges the boundaries of the community to include soils, waters, plants, and animals, or collectively: the land." *County of Freeborn v. Bryson*, 243 N.W.2d at 322, citing *Sand County Almanac* (1949) p. 203. We reaffirm our statement there that the state's environmental legislation had given this land ethic the force of law, and imposed on the courts a duty to support the legislative goal of protecting our state's environmental resources. Vanishing wetlands require, even more today than in 1976 when *Bryson* was decided, the protection and preservation that environmental legislation was intended to provide.

Under Minnesota's environmental protection act no permit for "natural resource management and development" can be issued where the activity will cause "pollution, impairment or destruction" of natural resources. Minn.Stat. 116D.04, subd. 6 (1986). Christenson's proposed ditching project would result in 1) impairment and destruction of a protected wetland; 2) it would interfere with a wildlife habitat; and 3) eliminate an area that has the natural capacity to improve the quality of water on its way to Lake Koronis. He has not sustained his burden of proving the project would be reasonable, practical and would adequately protect the public safety and promote the public welfare, as required by Minn.Stat. § 105.45. We affirm the commissioner's order denying Christenson's application for a permit to enlarge or rebuild private ditches to drain wetland 47–219.

Affirmed.

KELLEY and POPOVICH, JJ., took no part in the consideration or decision of this case.