STATE of Minnesota by Nina ARCHA-
BAL, Director of Minnesota Historical
Society and State Historic Preservation
Officer, Respondent (C7–92–518, C7–92–
566), Appellant (C6–92–543),

v.

The COUNTY OF HENNEPIN,
Defendant and Third-Party
Plaintiff, Respondent,

v.

COWLES MEDIA CORPORATION, et al.,
Intervenors, Appellants (C7–92–518),
Respondents (C6–92–543, C7–92–566),

v.

CITY OF MINNEAPOLIS, Third-Party
Defendant, Respondent (C7–92–518, C6–
92–543), Appellant (C7–92–566).

Nos. C7–92–518, C6–92–
543 and C7–92–566.

Supreme Court of Minnesota.

Feb. 5, 1993.

Michael Berens, Constance L. Hall, Minneapolis, for Cowles Media Corp, et al.

Hubert H. Humphrey, III, John R. Tunheim, Merwin W. Peterson, St. Paul, for Nina Archabal.

Robert J. Alfton, Michael T. Norton, Minneapolis, for City of Mpls.

Michael O. Freeman, Mark Chapin, Minneapolis, for Hennepin County.

GARDEBRING, Justice.

This case arises out of the proposed demolition of the Minneapolis National Guard Armory ("Armory"). Hennepin County ("the County") has purchased the Armory site in order to demolish the building to allow for the construction of a high-rise public safety facility ("PSF" or "jail").

In September 1990, the State Historic Preservation Officer, Nina Archabal (Archabal), brought a declaratory action, alleging a violation of the Minnesota Environmental Rights Act, Minn.Stat., ch. 116B ("MERA") and seeking to permanently enjoin the County from "demolishing, destroying or otherwise altering" the Armory. The trial court entered a temporary restraining order enjoining the County from destroying the Armory.

In March 1991, the trial court broadened the action to encompass all the legal issues generated by the proposed construction of the jail on the Armory block. The court ordered the County to implead the City as an indispensable party, because of issues involving the City's zoning laws. Appellants Cowles Media Company and Lutheran Brotherhood ("the landowners"), property owners of land adjacent to the Armory site, filed a second action for declaratory and injunctive relief under Minn.Stat. § 462.-357, subd. 5 (1992), seeking to block construction of the PSF on the Armory block.[1] A trial was held to determine, *inter alia,* whether the decision by the County to demolish the Armory complied with MERA, and whether this downtown site for the jail violated applicable city zoning laws. The trial court determined that there was no violation of either MERA or the zoning regulations. The matter is before this court on accelerated review from the district court.

Appellants argue that 1) the County did not sustain its burden of proof under

---

**1.** Minn.Stat. § 462.357, subd. 5 is the statute that controls zoning amendments in cities of the first class. The statute states in relevant part:
  In such cities amendments to a zoning ordinance shall be made in conformance with this section but only after there shall have been filed in the office of the city clerk a written consent of the owners of two-thirds of the several descriptions of real estate situate [sic] within 100 feet of the total contiguous property within one year preceding the request, and after the affirmative vote in favor thereof by a majority of the members of the governing body of any such city.
Minn.Stat. § 462.357, subd. 5 (1992).

MERA; 2) Hennepin County did not exhaust its remedies on the zoning issue; and 3) the trial court incorrectly weighed the factors under the balancing-of-the-public-interests test set forth in our previous zoning cases. Appellant Cowles Media Company and Lutheran Brotherhood (collectively "the landowners") appeal the trial court's decision that denied them a jury trial. Finally, respondent Hennepin County appeals the trial court's ruling that Archabal is not required to post a surety bond.

The Armory was built in 1935 and is regarded as one of the best examples of the WPA Moderne style of architecture in the country today. It is on the National Register of Historic Places. It is undoubtedly a "natural resource" within the protection of MERA.[2] While the district court concluded that the building required major renovations and appeared to be in a state of deterioration, the County's expert believed the building to be structurally sound. There is at present no plan for reusing the building, which has stood empty for a number of years.

The County and the City presently operate a joint jail/lock-up facility which is housed in the old Minneapolis City Hall and Courthouse, connected by a tunnel to the Hennepin County Government Center ("Government Center"). The parties agree that Hennepin County's jail is seriously overcrowded and that a new jail is needed. Furthermore, overcrowding in the County jail is not a new phenomenon. Renovations were completed in 1978 and 1987 to add badly needed space and variances were obtained from the Minnesota Department of Corrections ("DOC") to allow double bunking. Beginning in about 1987, the County began studying the overcrowding problem, acting through several committees and task forces.

In October 1988, the County's Public Safety Facility Executive Committee ("Executive Committee") recommended that a proposed new PSF be located on a full city block as close as possible to the Government Center, preferably within two blocks. This committee believed that transportation of detainees by van would have to take place if the PSF was sited more than two blocks from the Government Center. The Executive Committee identified several potential sites within two blocks of the Government Center, including the Armory block, the Cowles Media block and the Lutheran Brotherhood block.

Early in 1989, Hennepin County's Property Management Department identified the Armory block as the best site for the proposed PSF. In April 1989, Hennepin County exercised its option to purchase the Armory for $4.7 million, knowing that the Armory was listed on the National Register of Historic Places.

In August 1990, another County group, the Public Safety Facility Policy Committee ("Policy Committee") concluded that "[t]here is no perfect site for the new facility and all sites have opposition of one form or another." The Policy Committee expressed a preference for the Armory site, but noted that, because of limited land space, the Armory block was only suitable for a high-rise design for the PSF. The preference was qualified by the warning that future expansion of a high-rise facility would be problematic.[3]

In May 1990, the legislature enacted a law prohibiting the County Board from selling or issuing bonds for the construction of

---

2. The Armory falls under the protection of MERA as a "natural resource" because of its historic and architectural significance. *See* Minn.Stat. § 116B.02, subd. 4 (1992); *State by Powderly v. Erickson,* 285 N.W.2d 84, 88 (Minn. 1979) (factors to be considered in determining whether a structure is an historical resource). The trial court made a specific finding to this effect and the County does not dispute this determination.

3. Although the Policy Committee favored the Armory site, its second choice was a more remote site that would allow future expansion. However, this site, on Washington Avenue was not considered by the later Joint City/County PSF Planning Task Force "because it is in an area designated by the City of Minneapolis as the High Technology Corridor." The committee went on to state that the Washington Avenue site was "very well suited for a new Public Safety Facility."

the PSF until the Board entered into a planning process which would include:

(1) comparative analysis of alternative sites, including, but not limited to: site preparation factors, proximity to the county courthouse, potential construction or legal delays for each site, and integration into the long-range physical plan for the city of Minneapolis;

(2) programmatic plans relating to physical structure, construction, and operational costs; and

(3) continued use of the current jail facilities for correctional purposes for a period of at least ten years * * * [and] at least one public hearing.

1990 Minn. Laws ch. 592, § 4.

In response, the County board established the Joint City/County PSF Planning Task Force ("Joint Task Force"), a six-member group that planned to make final recommendations prior to September 1, 1990. However, three weeks after the Joint Task Force was formed, the County authorized the closing of the Armory sale. A few days later, the sale closed.

The Joint Task Force made a preliminary report in July 1990, which identified competing considerations that needed to be taken into account in order to select the best site for the proposed PSF:

The Task Force discussions have identified two major issues which have provided the departure points for considering sites. One of these is the issue of convenience for the criminal justice system. * * * Because of the interaction between the various components of the criminal justice system, a PSF within two blocks of the Government Center is extremely important.

The other issue deals with the need to build a jail that can easily be expanded. Projecting jail populations is an inexact science and the majority of jurisdictions nationally that build new jails have a tendency to underestimate their need. Most new jails that are being built are at or above capacity when they open. Consequently, it seems prudent to build on a site where there is room for horizontal expansion. The problem is that there is not a site large enough for horizontal expansion within two blocks of the Government Center. These two issues thus become mutually exclusive: convenience for the criminal justice system vs. easy expansion.

As a result of this dichotomy, the Task Force has identified two sets of sites. One set of sites provides convenience for the personnel in the criminal justice system by providing for high-rise construction within two blocks of the Government Center; whereas, the other set of sites provides room for expansion by constructing [a] mid-rise building on larger sites where another building can be added at a later time.

Public Safety Facility City/County Task Force, Preliminary Report, July 31, 1990, p. 1. This report identified fifteen sites, four high-rise and eleven mid-rise, and suggested continued examination of five of them, two of which were mid-rise sites.[4] This report also found that of the five sites remaining, only the Armory site, because it had been off the tax rolls since 1935, did not entail serious tax-loss consequences.[5]

The Joint Task Force issued its final report in September 1990, concluding that none of the sites examined was clearly advantageous on all the factors relevant to site selection. In addition, it found that any of the five sites would adequately meet the needs of the new PSF once the fundamental policy issue was resolved: conve-

---

**4.** These three potential high-rise sites were the Armory block, the Lutheran Brotherhood block and the Cowles Media block. The Glacier Park Company site and the 7th Street North site were the two mid-rise sites, both located within about ten blocks of the Government Center.

**5.** The Joint Task Force found the following tax base losses would occur if construction proceeded on the respective lots in their current state:

1. Armory: $0 (off tax rolls)
2. National City Bank: $323,000 (owned by Lutheran Brotherhood)
3. Cowles Media: $275,000
4. Glacier Park: $56,000
5. 7th Street North: $285,000

nience to the criminal justice system vs. ability to expand future jail capacity beyond 1400 beds.

The Task Force also evaluated relative development costs, determining that the total development cost difference between a mid-rise, which is cheaper, and high-rise site, assuming roughly equal operating costs, was approximately $26.6 million. In October 1990, the County Board concluded that the Armory was the best site for the location of the PSF.

## I.

■ The first issue we examine is whether the trial court acted under "review" or "de novo" jurisdiction in considering whether the county complied with the requirements of MERA. Appellant Archabal argues that the trial court's authority in this matter is limited by the Minnesota Administrative Procedure Act ("MAPA") Minn.Stat. §§ 14.001–14.69 (Minn.1992). Under Minn.Stat. § 14.69, if a trial court is reviewing the action of an administrative body, it has only limited powers of review. *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 823 (Minn.1977). Our review is then made upon an independent examination of the record without deference to the findings of the trial court. *People for Envtl. Enlightenment and Responsibility, Inc. (PEER) v. Minnesota Envtl. Quality Council,* 266 N.W.2d 858, 868 n. 13 (Minn. 1978). If, on the other hand, no administrative determination is under review, the trial court has de novo jurisdiction in a MERA action and this court applies the "clearly erroneous" standard of review to the findings of fact. *See Krmpotich v. City of Duluth,* 483 N.W.2d 55, 56–57 (Minn.1992). In either instance, conclusions of law in a MERA action are properly reviewable by this court without any deference to the trial court. Minn.Stat. § 14.69.

■ By its own terms, MAPA covers only "agency" actions. The term "agency" is defined at Minn.Stat. § 14.02, subd. 2 as

any state * * * board * * *, having a statewide jurisdiction and authorized by law to make rules and adjudicate contested cases * * *.

The case law is also clear that the MAPA only applies to "boards and the like 'having a statewide jurisdiction.'" *Minneapolis Area Dev. Corp. v. Common Sch. Dist. No. 1870,* 131 N.W.2d 29, 39 (Minn.1964) (citing former version of Minn.Stat. § 15.-042); *see also Bahr v. City of Litchfield,* 420 N.W.2d 604, 606 (Minn.1988).

■ Apparently conceding that the County does not fit within this definition of "agency," Archabal argues that the trial court, nevertheless, had only review jurisdiction, making two separate claims. First, she argues that the County had "administrative authority" under Minn.Stat. § 641.01 to construct and site a jail and the duty to complete an Environmental Assessment Worksheet under MERA, and that this somehow brings the County's action within the ambit of MAPA.

Second, Archabal claims that because under Minn.Stat. §§ 641.21 and 641.22 (1992) the Commissioner of Corrections must give advice and approval to the County relating to the jail and its operation, MAPA is implicated. Appellant interprets these statutes to mean that the trial court has only review jurisdiction over the Commissioner's and County's decision to site the jail. She cites neither case law nor statute to support this interpretation, and we reject this argument. It is the County, not the Department of Corrections, which is proposing to destroy the Armory, and no amount of handwaving brings the County within the purview of MAPA. It is simply not an "agency," and only "agencies" are covered by MAPA.

Further, in order for judicial review of the County's decision to come under MAPA, there must first be a "contested case." *Minnesota Pub. Interest Research Group (MPIRG) v. Minnesota Envtl. Quality Council (MEQC),* 237 N.W.2d 375, 381 (Minn.1975). This term is defined in Minn.Stat. § 14.02, subd. 3:

"Contested case" means a proceeding before an agency in which the legal rights, duties, or privileges of specific parties are required by constitutional right to be determined after an agency hearing. *"Contested case" does not in-*

clude hearings held by the department of corrections involving the discipline or transfer of inmates or other hearings relating solely to inmate management.

(Emphasis added). There is no provision in the statutes cited by appellant that suggests that hearings of any kind are required when the Commissioner of Corrections offers advice and grants approval to the County's plans for a jail, or that any such hearing was held in this matter. Moreover, it can be argued that such advice and approval relates "solely to inmate management" and thus, is insulated from the MAPA.

In either case, there is no contested case here and no judicial review under the MAPA. Therefore, the trial court's exercise of de novo jurisdiction was not in error and this court is limited to reviewing the trial court's factual findings under the clearly erroneous standard. *Krmpotich*, 483 N.W.2d at 56–57.

## II.

The central issue in this case is whether the County can legally destroy a resource otherwise protected under MERA because there are no feasible and prudent alternatives to its destruction. In enacting MERA, the legislature declared that it is state policy to

create and maintain within the state conditions under which human beings and nature can exist in productive harmony in order that present and future generations may enjoy clean air and water, productive land, and other natural resources with which this state has been endowed.

Minn.Stat. § 116B.01 (1992). Under MERA, natural resources are defined to include "all mineral, animal, botanical, air, water, land, timber, soil, quietude, recreational and historical resources." Minn. Stat. § 116B.02, subd. 4 (1992). Historical resources are not defined within MERA; however, in *State by Powderly v. Erickson*, 285 N.W.2d 84 (Minn.1979), we identified certain factors that should be taken into account in determining whether a building falls under the protection of MERA, looking principally to the criteria used to determine what buildings are included on the National Register of Historic Places:

The quality of significance in American history, architecture, archeology, and culture is present in districts, sites, buildings, structures and objects of State and local importance that possess integrity of location, design, setting, materials, workmanship, feeling and association and:

(1) That are associated with events that have made a significant contribution to the broad patterns of our history; or

(2) That are associated with the lives of persons significant in the past; or

(3) That embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or

(4) That have yielded, or may be likely to yield, information important in history or prehistory.

*Powderly*, 285 N.W.2d at 88 (quoting 36 C.F.R. § 800.10(a)). All parties agree that the Armory is within the MERA definition of "natural resource."

Minn.Stat. § 116B.04 sets forth the burden of proof the various parties must bear in bringing an action under MERA. First, the plaintiff must make a prima facie showing that the conduct of the defendant has, or is likely to cause the pollution, impairment or destruction of "[a] natural resource located within the state." Minn.Stat. § 116B.04 (1992). In *Powderly*, this court set out the requirements for such a prima facie showing. First, the plaintiff must show the existence of a protectible natural resource and second, the pollution, impairment or destruction of that resource. *See Powderly*, 285 N.W.2d at 87–88. In this case, it is clear that appellant Archabal met her burden; the Armory is an historic resource and under this court's decision in *Powderly*, historic resources are protected under MERA. It is equally clear that the Armory's value as an historic resource will be destroyed by the

alterations necessary to construct a PSF, and the trial court so found.[6]

The defendant may attempt to rebut the plaintiff's prima facie case with a showing of contrary evidence or, as in this case, offer an affirmative defense. In offering an affirmative defense the defendant must show:

> that there is no feasible and prudent alternative and the conduct at issue is consistent with and reasonably required for promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its air, water, land and other resources from pollution, impairment, or destruction. Economic considerations alone shall not constitute a defense hereunder.

Minn.Stat. § 116B.04 (1992). Thus, to establish an affirmative defense under MERA, the County must show two things: 1) that there is no "feasible and prudent" alternative site to the Armory block for the proposed PSF; and 2) that the building of the PSF on the Armory site is required for health, safety or welfare reasons, taking into account the state's strong commitment to the environment.

Guidance for application of this requirement can be found in a trio of Minnesota cases: *Powderly*, 285 N.W.2d at 84; *People For Envtl. Enlightenment and Responsibility (PEER) v. Minnesota Envtl. Quality Council*, 266 N.W.2d 858 (Minn. 1978); and *County of Freeborn by Tuveson v. Bryson*, 243 N.W.2d 316 (Minn. 1976). In *Powderly* we stated:

> In deciding whether defendants have established an affirmative defense under MERA, *the trial court is not to engage in wide-ranging balancing of compensable against non-compensable impairments.* Rather, protection of natural resources is to be given paramount consideration, and those resources should not

be polluted or destroyed unless there are truly unusual factors present in the case or the cost of community disruption from the alternatives reaches an extraordinary magnitude.

285 N.W.2d at 88 (citing *Bryson*, at 321) (emphasis added).

*PEER* dealt with the siting of high voltage transmission lines. The trial court agreed with the agency and residents whose homes would be destroyed by the proposed location of the lines that another route should be used which would entail the loss of fewer homes. This court cited *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 411, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1976), for the notion that the balancing of compensable damages with those that are noncompensable is inappropriate under MERA.

> Persons who lose their homes can be fully compensated in damages. The destruction of protectible environmental resources, however, is noncompensable and injurious to all present and future residents of Minnesota.
>
> > Any other result would be contrary to *Citizens to Preserve Overton Park, Inc. v. Volpe*, in which the United States Supreme Court rejected such wide ranging balancing of compensable with noncompensable impairment. In order to protect natural resources to the fullest extent possible, [that] court required that truly extraordinary disruption be demonstrated before a prudent and feasible alternative to an environmentally destructive action would be refused.

*PEER*, 266 N.W.2d at 869–70 (citations omitted).

> Finally, in *Bryson, supra,* the court quoted and explicitly approved of *Overton Park.*

---

6. When the County authorized the purchase of the Armory, it also intended to identify some mitigation measures in order to preserve historically important aspects of the Armory that were compatible with the needs of the public safety facility. Those measures included preserving the headhouse and the arch of the Armory by incorporating them into the design of the new building. However, the County's own experts testified that such a plan would destroy the Armory as an historic resource and would compromise the design of the public safety facility. Accordingly, the trial court ruled that the County was not required to take such preservation measures.

[W]e note that the affirmative defense under [MERA] is apparently derived from Federal environmental law. Section 4(f) of the Department of Transportation Act of 1966, as amended, 49 U.S.C.A. § 1653(f), provides that the Secretary of Transportation shall not approve acquisition of public parkland for construction of Federal-aid highways unless 'there is no feasible and prudent alternative.' In *Citizens to Preserve Overton Park, Inc. v. Volpe,* respondents argued that 'the requirement that there be no other "prudent" route requires the Secretary to engage in a wide-ranging balancing of competing interests.' The United States Supreme Court emphatically rejected this contention:

> But no such wide ranging endeavor was intended. It is obvious that in most cases considerations of cost, directness of route, and community disruption will indicate that parkland should be used for highway construction whenever possible. * * *

> Congress clearly did not intend that cost and disruption of the community were to be ignored by the Secretary. But the very existence of the statutes indicates that protection of parkland was to be given paramount importance. The few green havens that are public parks were not to be lost *unless there were truly unusual factors present in a particular case or the cost of community disruption resulting from alternative routes reached extraordinary magnitudes. If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems.*

The purpose and language of the Federal statute and our Act are substantially the same. Therefore, we follow the decision of the United States Supreme Court and give our statute a similar construction.

As here applied, this construction means that, in the absence of unusual or extraordinary factors, the trial court must enjoin environmentally destructive conduct if a feasible and prudent alternative is shown.

*Bryson,* 243 N.W.2d at 320–21 (citations omitted) (emphasis added).

We believe that these cases, taken together, establish an extremely high standard for defendants to meet in establishing an affirmative defense. The trial court concluded that the defendant met its burden in this case. We disagree. While the evidentiary record in this case reveals strong community interests in competition with MERA's emphasis on preservation of natural resources, it cannot be said that there is no feasible and prudent alternative, particularly when the county's own Task Force could itself not find one site that was clearly advantageous over others it considered.

Although the trial court cites applicable law, its reasoning appears to place primary emphasis on the needs of the criminal justice system, rather than addressing whether siting the PSF on a site other than the Armory site would cause "community disruption of an extraordinary magnitude." For example, in its memorandum, the trial court says:

> My perception of the public interest is to do everything within my power to resolve the issues in this litigation so that the criminal justice system operates at maximum efficiency with the least amount of unnecessary stress and that maintaining public safety is given top priority.

Trial Court Memorandum at 3. And at a later point in the memorandum, the court says:

> [Previously] I made mention of two matters which I consider to be of paramount importance in determining what is in the public interest in this lawsuit.

> Priority number one is to maintain the maximum degree of public safety which it is possible to do. Priority number two is to have the new adult detention center * * * be an integral part of a criminal justice system which will serve this county in a maximally efficient manner for the next 50 years.

Trial Court Memorandum at 5. In identifying its own priorities, the court nowhere makes mention of the legislative priority reflected in the MERA, which emphasizes "the state's *paramount concern* for the protection of its * * * natural resources." Minn.Stat. § 116B.04 (1992) (emphasis added). Nor is there further analysis of this "paramount concern" elsewhere in the opinion.

This apparent misunderstanding of the law is further reflected in the "truly unusual factors" which the court says are present, as a matter of law, on these facts.

Number one, public safety *demands* that the new facility be sited within two blocks of the Government Center so a secure tunnel can be used to transport the detainees from the detention facility to the courthouse.

Two, minimizing additional stress on the County Public Defender's Office *demands* that the new facility be sited within two blocks of the Government Center so that transportation time for the public defenders between the two facilities be kept at an absolute minimum. * * *

Three, minimizing additional stress on the Hennepin County Sheriff's office *demands* that the new public safety facility be sited within two blocks of the Government Center so that detainees can be delivered to the judges in this building with maximum efficiency and in the most economical manner.

Four, minimizing additional stress on the Minneapolis Police Department *demands* that the new public safety facility be sited within two blocks of the Government Center so that down time for booking, interrogation, and supplemental investigation (forensic and other) is kept at an absolute minimum.

Five, maximizing return on County facilities such as the Sheriff's crime lab, the County Medical Center, the County food preparation facility, and the County energy center *demands* that the new facility be sited along the Sixth Street Governmental corridor which has been identified during the trial of this case.

Those facilities represent a huge investment of public monies. The financial pressures on all governmental units that exist in today's day and age require that all public services be utilized to their maximum efficiency.

\* \* \* \* \* \*

[I] am not unmindful of the fact that there are two vacant blocks that exist to the north and south of the Armory block. * * *

[T]he Court is satisfied that the result [of siting a PSF on either of those blocks] would be to severely jeopardize the presence of Cowles Media and Lutheran Brotherhood as corporate tenants of the city of Minneapolis. * * *

[T]he loss of jobs and tax revenues which would result from that occurrence would be catastrophic to the city. Accordingly, siting the public safety facility on one of those blocks would result in cost and disruption to the city of extraordinary magnitude and supports the County's decision to allow the Armory to be demolished and to have the site used for the new public safety facility.

Trial Court Memorandum at 8–10.

This language, which mirrors the trial court's "Definitive Findings of Fact," appears to be directed at meeting the standard as enunciated by our earlier cases; however, the evidentiary record simply does not support these conclusions.

Aside from the tax benefits, the location of the PSF on the Armory block yields two distinct advantages: a tunnel can be constructed to connect the PSF to the Government Center, and the PSF would be sited close to other County facilities. This location also entails one serious drawback: the lack of expansion capability.

Conflicting evidence was presented with regard to the cost and public safety risk associated with transporting prisoners from one of the more distant sites to the courthouse. The question is whether this means of prisoner transfer "presents a safety risk of the magnitude required by *Overton Park.*" *Stop H–3 Ass'n v. Dole,* 740 F.2d 1442, 1454 (9th Cir.1984), *cert. denied,* 471 U.S. 1108, 105 S.Ct. 2344, 85

L.Ed.2d 859 (1985). The trial court concluded that in order to maintain public safety, pre-trial detainees should be transported from the PSF to court at the Government Center via a secure tunnel. The court also found that in order to make such a tunnel practical, the PSF would have to be sited within two blocks of the Government Center. The supervisor of the Transportation Fugitive Unit of the Department of Corrections testified that whenever a prisoner is moved out of a secure perimeter, the chance for escape exists, but the level of risk of escape was never quantified, nor has the County ever conducted a study of the risk.

Other evidence indicated that a far greater number of detainees than are present in the current county jail are transported by bus in other cities each day. For example, in New York City, 1,000–1,200 prisoners are transported every day from their point of detention to court. By contrast, the deputy sheriff, who is currently captain of the jail in Minneapolis, estimated that at the present prisoner population, assuming the new PSF included arraignment courtrooms as planned, between 25 and 30 detainees a day would have to be transported to the Government Center. Additionally, appellants presented expert testimony that disputed the necessity of a tunnel. Their expert noted that, from a security standpoint, the difference between transporting detainees by tunnel and by mechanical transport was so marginal as to amount to no concrete advantage. We conclude that in the face of such conflicting evidence on the public safety risk, the need to transport prisoners from a remote site is not a truly unusual situation nor extraordinarily disruptive.

The trial court also concluded that the PSF must be sited within two blocks of the Government Center to avoid putting additional stress on the Minneapolis Police Department, the County Public Defender's Office, the County Sheriff's Department and the Hennepin County District Court. Evidence directed to the impact on these departments of locating the PSF at a remote site was also very limited, focusing specifically on additional costs to the Hennepin County Public Defender's office. We conclude that these economic considerations, speculative as they are, are not sufficient to meet the standard of MERA and our cases applying it.

The court also ruled that the PSF must be connected to other County facilities along the so-called "Sixth Street corridor," in order to allow for better coordination with existing county facilities. Meals could be prepared outside the PSF, thus lessening their cost, there would be an easy link to the Hennepin County Medical Center, and a substantial savings in annual energy costs would result. While maximizing the return on various County facilities may be desirable and even constitute a good reason to site the PSF on the Armory block, failure to fully realize the potential of these facilities clearly does not rise to the level of community disruption or extraordinary circumstances contemplated by MERA. Moreover, the two other sites within two blocks of the Government Center, the Cowles Media block and the Lutheran Brotherhood block, would also allow this objective to be met.

Finally, the matter of the landowners, Cowles Media Company and Lutheran Brotherhood, is only slightly more difficult. First, the departure from downtown of one of these parties would undoubtedly hurt the City and probably the County. However, the evidence showed and the trial court so found, that each of the landowners would reconsider its expansion plans and even whether to remain in downtown Minneapolis even if the PSF was built on the *Armory block.* Second, the loss of the jobs and tax base from one of these parties is purely economic—*i.e.,* it is a compensable loss. Although cost must enter into the calculus of whether an extraordinary community disruption has occurred, economic considerations alone are not·sufficient to make out an affirmative defense under MERA. Minn.Stat. § 116B.04 (1992).

The biggest single factor mitigating against building the PSF on the Armory site, aside from the concern for the State's natural resources, is the difficulty of future expansion on that site. An allowance

is made for this inability in the design of the proposed PSF by including four floors of unfinished "loft" space that could be completed as needed to increase the capacity of the facility from 1,056 to 1,440. However, future needed jail capacity is often difficult to ascertain with any accuracy, and if the County's current projections are too low, as they often have been, a high-rise jail, like the one planned for the Armory site, might not be able to handle the added prisoner population. Additionally, appellants' jail expert testified that a mid- or low-rise jail could be built more quickly than the planned high-rise facility so that the overcrowding in the current jail could be eased sooner.

The district court also found that the County has always been concerned with the costs associated with constructing and operating the PSF. Accordingly, the court took the potential loss from the tax base into account in determining whether the landowners' lots presented "feasible and prudent" alternatives. In addition, the court found that the construction cost of the high-rise would be higher than that of a low-rise or mid-rise facility, and its operating costs are more than that of a low-rise, as well. While the evidence was conflicting as to the magnitude of the cost differential, all of the testimony indicated that the high-rise would be more costly to construct, operate and expand.

While we commend the trial court for its meticulous findings on the potential advantages of the Armory site, its ultimate conclusion misses the mark. It may well be true that use of the Armory site may be more convenient, indeed may be more efficient, than alternative more remote sites, but that is simply not enough under MERA and our cases. Nothing in the reasons cited, nor the evidence underlying them, rises to the level of "truly unusual factors" or "community disruption of extraordinary magnitude." Further, the trial court seems to have engaged in precisely the kind of wide-ranging balancing of compensable versus non-compensable interests which our case law forbids. It may cost slightly more to transport prisoners from a remote site PSF, and to compensate for time spent by public defenders to travel to their clients, although even these increases may be offset by savings in construction and operation. But even if there is some increased cost, MERA itself requires that "[e]conomic consideration alone shall not constitute a defense." Minn.Stat. § 116B.04 (1992).

In order to establish an affirmative defense under MERA, the County had to show that no alternative was available that did not itself create extreme hardship. This it failed to do. Therefore, we must reverse the trial court's conclusion that the Armory may be destroyed to construct a PSF because there are no feasible and prudent alternatives.[7]

We fully realize that this may be an unpopular result given the need for a new jail and the lack of any foreseeable redevelopment for a building in some stage of deterioration. However, the potency of this rule of law, as enunciated in MERA and our previous cases, is vital to the protection of our natural resources. To diminish its reach could only cause confusion and uncertainty in later cases. Moreover, to fashion an exception for historic buildings such as this one is not within the province of this court. Therefore, we hold as a matter of law that there are feasible and prudent alternatives to the Armory site for the proposed PSF and we reverse the decision of the district court.

PAGE, Justice, took no part in the consideration or decision of this case.

---

**7.** Because we decide this case on the MERA issue alone it is unnecessary to reach the other questions on appeal.