**STATE of Minnesota by Douglas J. SCHALLER, Petitioner, Appellant,**

v.

**COUNTY OF BLUE EARTH, Respondent.**

No. C2–96–1004.

Supreme Court of Minnesota.

May 22, 1997.

Rehearing Denied June 25, 1997.

Keith S. Moheban, Jeanne M. Cochran, Robert M. Hogg, Leonard, Street & Deinard, P.A., Minneapolis, Mark F. Ten Eyck, Minnesota Center for Environmental Advocacy, St. Paul, for amicus curiae Minnesota Center for Environmental Advocacy.

## OPINION

KEITH, Chief Justice.

Appellant Douglas Schaller (Schaller) challenges the construction of a portion of a new two-lane highway, County State Aid Highway 90 (CSAH 90),[1] south of Mankato in Blue Earth County. Schaller sought an injunction under the Minnesota Environmental Rights Act (MERA), Minn.Stat. ch. 116B (1996), barring that portion of the CSAH 90 project which traverses a ravine near the Blue Earth River on the Schaller family homestead.

Schaller's complaint alleged two counts of pollution, impairment or destruction of resources as defined under MERA § 116B.02, subd. 5. Count I alleged that projected traffic volumes on CSAH 90 for the year 2010 would generate noise in excess of state standards. See Minn.Stat. §§ 116B.02, subd. 5, 116B.03, subd. 1. Count II alleged that the destruction of natural resources in the Schaller ravine would materially adversely affect the environment under MERA. See id.

The district court granted the county's motion for summary judgment on Count I. After a hearing, the district court granted the county's motion to dismiss Count II. In an unpublished decision, the court of appeals upheld the district court's rulings. *State by Schaller v. County of Blue Earth*, No. C2-96-1004, 1996 WL 438845, at *3 (Minn.App. Aug. 6, 1996). We affirm.

In 1989, Blue Earth County began formally studying the Mankato South Route, now known as the CSAH 90 project. Traffic

Karl O. Friedrichs, Friedrichs & Marsh, P.A., North Mankato, for Appellant.

Lawrence A. Moloney, Joel E. Abrahamson, Doherty, Rumble & Butler, P.A., Minneapolis, Russ E. Arneson, Blue Earth County Attorney, Mankato, for Respondent.

1. CSAH 90 is being constructed as a two-lane rural highway. Projected traffic volumes for the year 2010 exceed the threshold for a four-lane highway west of Trunk Highway (T.H.) 22; therefore, the County acquired enough right-of-way to accommodate a four-lane, divided rural roadway between T.H. 169 and T.H. 22.

studies conducted at that time identified a need to accommodate significant emerging east-west traffic volumes south of the Mankato city proper, which currently must utilize congested routes through downtown Mankato. The county considered 19 alternatives, known as Segments A through S, for the proposed route and examined each with respect to environmental impacts, community impacts, historical and cultural resources affected, traffic safety and engineering. Those segments with the most severe projected environmental and community impacts were eliminated from consideration in the Draft Environmental Impact Statement (EIS).

The Draft EIS considered three roadway corridor alternatives, designated the green, purple, and blue alternatives, along with a no-build alternative. After receiving comments and holding two public hearings, the county selected a hybrid purple-blue alternative as the preferred alternative.

Prior to selecting the purple-blue alternative, the county's consulting engineers undertook noise monitoring at 35 locations to allow the county to compare projected noise impacts among the three alternative routes. All three proposed routes had residences which, based on the assumptions utilized, were projected to experience noise levels above present state standards. The purple-blue hybrid, however, reduced these potential impacts to one residence exceeding the daytime standard in the year 2010 and nine residences exceeding the nighttime standard for one hour, between 6:00 a.m. and 7:00 a.m. Count I of Schaller's complaint alleges that because of the projected noise violations, the CSAH 90 project is enjoinable under MERA as conduct "which violates, or is *likely to violate*, any environmental quality standard * * *." Minn.Stat. § 116B.02, subd. 5 (emphasis added).

The district court granted the county's motion for summary judgment as to Count I,

holding that Schaller failed to prove that construction of CSAH 90 was "likely" to violate MPCA noise standards as required to establish a prima facie case under MERA. However, the court denied the county's motion for summary judgment as to Count II.

Count II alleges that the segment of the CSAH 90 project utilizing the Schaller ravine is likely to materially adversely affect the environment by disturbing mineral, animal, botanical, water, land, timber, soil, quietude, recreational and historical resources protected under MERA. See Minn.Stat. § 116B.02, subds. 4–5. At a hearing before the district court, in addition to his own testimony, Schaller presented the testimony of three witnesses on the impact of the proposed highway project on the natural resources encompassed by the Schaller ravine.

The Schaller farm is a Century Farm,[2] which Schaller contends should be protected as a historical resource under MERA. See Minn.Stat. 116B.02, subd. 4. The Schaller ravine is a quiet area and provides habitat for numerous songbirds and wildlife species including fox snakes, wild turkeys, white tail deer and squirrels. Although there are no rare or endangered species present in the ravine, the fox snake was previously listed as a "special concerns" species by the Department of Natural Resources (DNR) because of the danger that collectors will harvest too many of the species for sale as pets.[3] Although no rare or endangered species would be affected, wildlife species present in the ravine would be adversely affected by increased roadkill because of the presence of the highway.

Schaller also raised the issue of "forest fragmentation" due to the clearing of an area of maple-basswood forest present in the ravine. Forest fragmentation is simply the fragmenting of large forest blocks into smaller non-continuous blocks of woodland habitat. Such fragmentation can be deleteri-

---

2. The Century Farm Program was inaugurated in 1976 as a joint project of the Minnesota State Fair and *The Farmer* magazine. Dorothy L. Wanless, *Century Farms of Minnesota: One Hundred Years of Changing Life Styles on the Farm* 11 (1985). To qualify for recognition as a Century Farm, a farm must be: (1) at least a century old, (2) owned continuously over that period of time

by one family, and (3) fifty acres or more in size. *Id.*

3. A witness for the County testified that at the time of the hearing in this matter, the DNR was proposing that the fox snake be removed from the special concerns species list.

ous to neo-tropical songbirds because it may encourage the infiltration of predator brown-headed cowbirds to the fragmented area.

Finally, Schaller introduced evidence that the ravine contains a plant known as Indian Pipe, which although not rare or unique had not previously been observed in Blue Earth County.

The county responded to the evidence offered by Schaller by offering testimony seeking to establish that none of the natural resources affected are threatened, endangered, rare or unique; that the Schaller ravine and homestead offer no particular historical significance; that the Schaller ravine is already fragmented and inhabited by the brown-headed cowbird; and that both the ravine and remainder of the Schaller property are already subject to a high degree of degradation that would be partially remediated by the CSAH 90 project. The county also presented evidence of efforts it has undertaken to mitigate any environmental effects of the CSAH 90 project and argued that the CSAH 90 project as a whole would have a positive impact on the environment.

The county first established that of the 31 acres taken for the right of way in the Schaller ravine area, only 17.5 acres will be disturbed by construction. Of these, only 9 acres are wooded.[4] The county's maple-basswood forests increased by approximately 50% between 1977 and 1990, and the wooded habitat lost in the ravine constitutes thirty-four one-thousandths of one percent (.034%) of such forests in the county.

The county next asserted that the CSAH 90 project would not disturb any natural resources of historical significance and submitted as evidence a letter from the Minnesota Historical Society stating, "[W]e conclude that the [CSAH 90] project will have no adverse effect on properties eligible for or listed on the National Register of Historic Places."[5] Although Schaller's Century Farm would be affected, testimony established that the family would retain enough land to preserve the property's Century Farm status.

The county's witnesses testified that the wooded area in the Schaller ravine is already fragmented and home to the brown-headed cowbird.[6] Moreover, the ravine itself is "quite degraded," according to a wetland biologist testifying for the county. A power line spans the ravine; there is an erosion problem, which carries agricultural fertilizers and sediment into the river; and there is an area near the top of the ravine where rusting cans, bottles, and debris have been dumped and are washing down the slope.

Finally, the Public Works Director for the county testified as to mitigation efforts the county has undertaken to compensate for any negative environmental impacts caused by the CSAH 90 project. In addition to correcting the erosion problem in the ravine, the county has acquired an approximately 115 acre site at Indian Lake in order to reestablish a wetland there to compensate for the taking of one-half acre of wetland in the Schaller ravine. An 82–acre tract known as the Ulmen farm has been acquired by the county and added to Minneopa State Park. Finally, a bicycle trail will be constructed on the north side of the highway to increase recreational access to the area.

After hearing all evidence on Count II, the court granted the county's motion to dismiss. Applying the four-factor test from Michigan adopted by our state's court of appeals in *State ex rel. Wacouta Township v. Brunkow Hardwood Corp.*, 510 N.W.2d 27, 30 (Minn. App.1993), the district court determined that while there would be *some* adverse effect on the environment from the construction of CSAH 90, the effect would not be *material.*

---

4. If the highway is expanded to four lanes as projected, another 12 to 13 wooded acres may be disturbed.

5. We have previously looked principally to the criteria used to determine whether a property qualifies for inclusion on the National Register of Historic Places to determine whether it qualifies

as a "natural resource" under MERA. *See State by Archabal v. County of Hennepin*, 495 N.W.2d 416, 421 (Minn.1993); *State by Powderly v. Erickson*, 285 N.W.2d 84, 88 (Minn.1979).

6. Douglas Schaller himself testified that he had observed a brown-headed cowbird fledgling on the property in the summer of 1995.

On appeal, Schaller and amicus Minnesota Center for Environmental Advocacy (MCEA) argue that application of the *Wacouta* factors is contrary to the legislature's express intent to further the state's paramount concern for the protection of its air, water, land and other natural resources and unduly restricts the scope of MERA. Schaller also argues that the district court erred in granting summary judgment on Count I, the noise complaint, because the EIS projects that a noise violation will result if CSAH 90 is completed as designed.

## I.

We first address Schaller's contention that applying the *Wacouta* factors to determine whether a proposed action is likely to materially adversely affect the environment is contrary to the policy considerations underlying MERA. The Minnesota Environmental Rights Act was enacted in 1971 to establish a private right of action by which "[a]ny person residing within the state" might sue—in the name of the state—any person for declaratory or equitable relief to protect the state's natural resources from "pollution, impairment, or destruction." Minn.Stat. § 116B.03, subd. 1.

The express legislative purpose behind the civil remedy established in MERA was "to create and maintain within the state conditions under which human beings and nature can exist in productive harmony in order that present and future generations may enjoy clean air and water, productive land, and other natural resources with which this state has been endowed." *Id.* § 116B.01. MERA broadly defines protected "natural resources" as follows:

> Subd. 4. Natural resources shall include, but not be limited to, all mineral, animal, botanical, air, water, land, timber, soil, quietude, recreational and historical resources. Scenic and esthetic resources shall also be considered natural resources when owned by any governmental unit or agency.

*Id.* § 116B.02, subd. 4.

There are two types of pollution, impairment or destruction of natural resources subject to action under MERA: (1) "any conduct by any person which *violates,* or is *likely to violate,*" any environmental quality standard, permit, or similar rule; and (2) "any conduct which *materially adversely affects* or is *likely to* materially adversely affect *the environment.*" *Id.* § 116B.02, subd. 5 (emphasis added). Count I, the alleged noise violation, arises under the first definition of pollution, impairment, or destruction under MERA. Count II, alleging the adverse effects of the CSAH 90 on the Schaller ravine, arises under the second definition.

The statute also defines the burden of proof applicable in MERA actions. First, the plaintiff must make a prima facie case that the defendant's conduct constitutes pollution, impairment, or destruction of protectible natural resources under either of the definitions included in Minn.Stat. § 116B.02, subd. 5. *See* Minn.Stat. § 116B.04. There are two prongs to the plaintiff's prima facie case. First, there must be "a protectible natural resource" under MERA. *Archabal,* 495 N.W.2d at 421. Second, conduct by the defendant must cause or be likely to cause "pollution, impairment or destruction"—as defined in Minn.Stat. 116B.02, subd. 5 above—of that resource. *Id.* The defendant may rebut the prima facie by submitting evidence to the contrary. *Id.* at 422. If the defendant is unable to rebut the plaintiff's prima facie case, an affirmative defense is available in cases alleging a materially adverse effect on the environment:

> The defendant may also show, by way of an affirmative defense, that there is *no feasible and prudent alternative* and the conduct at issue is *consistent with and reasonably required* for promotion of the public health, safety, and welfare in light of the state's *paramount concern* for the protection of its air, water, land and other natural resources from pollution, impairment, or destruction. Economic considerations alone *shall not* constitute a defense hereunder.

Minn.Stat. § 116B.04 (emphasis added).

By the terms of the statute, the affirmative defense of "no feasible and prudent alternative" is not available for MERA claims alleging violation of an environmental quality

standard. *See id.; see also McGuire v. County of Scott,* 525 N.W.2d 583, 585–86 (Minn.App.1994) (holding that a defendant may not assert the affirmative defense under MERA when the evidence revealed a violation of an MPCA noise pollution standard), *pet. for rev. denied* (Minn. Mar. 14, 1995).

In determining whether the CSAH 90 project segment crossing the Schaller ravine would likely materially adversely affect the environment, the district court applied a four-part test borrowed from Michigan state courts by our state's court of appeals in *Wacouta.*[7] Recognizing that MERA is modeled after the Michigan Environmental Protection Act, Mich. Comp. Laws §§ 691.1202–.1207 (1990), the *Wacouta* court borrowed the Michigan courts' test for determining whether an action's effect on natural resources is sufficient to justify judicial intervention. *Wacouta,* 510 N.W.2d at 30 (citing *People for Envtl. Enlightenment & Responsibility (PEER), Inc. v. Minnesota Envtl. Quality Council,* 266 N.W.2d 858, 866 (Minn.1978) (recognizing that this court has previously "[f]ollow[ed] the lead of Michigan" in interpreting MERA)).

The *Wacouta* court noted that "[a]lmost every human activity has some kind of adverse impact on a natural resource" and concluded that "[w]e cannot construe MERA as prohibiting virtually all human enterprise." *Wacouta,* 510 N.W.2d at 30 (citing *West Mich. Envtl. Action Council, Inc. v. Natural Resources Comm'n,* 405 Mich. 741, 275 N.W.2d 538, 545 (1979), *cert. denied,* 444 U.S. 941, 100 S.Ct. 295, 62 L.Ed.2d 307 (1979), and *State v. Neisen,* 415 N.W.2d 326, 329 (Minn. 1987)). Consequently, the *Wacouta* court adopted the Michigan test to give effect to the statutory limitation that conduct must "materially adversely affect" the environment to be enjoined as pollution, impairment or destruction of natural resources under Minn.Stat. § 116B.02, subd. 5. *Id.*

The test weighs the following four factors:

(1) whether the natural resource involved is rare, unique, endangered, or has historical significance,

(2) whether the resource is easily replaceable, (for example, by replanting trees or restocking fish),

(3) whether the proposed action will have any significant consequential effect on other natural resources (for example, whether wildlife will be lost if its habitat is impaired or destroyed), and

(4) whether the direct or consequential impact on animals or vegetation will affect a critical number, considering the nature and location of the wildlife affected.

*Wacouta,* 510 N.W.2d at 30 (quoting *City of Portage,* 136 Mich.App. at 282, 355 N.W.2d at 916).

The *Wacouta* court applied the Michigan factors to enjoin logging activity which the court concluded would have threatened bald eagle roosting sites. The court opined, "In short, the eagles and the roosts are rare, difficult to replace, interrelated, and constitute a critical number. It is clear that the effect of the enjoined activities on the eagles and the roosts was likely to have a material adverse effect on the environment." *Id.* at 31.

Applying the *Wacouta* standard, the district court in this case concluded that Schaller failed to prove that the effect on the ravine would be material. The court noted that the natural resources affected are not "particularly rare, unique or endangered"; the resources are replaceable "in that the County can replant trees" and woodland acres are increasing in the county; the construction is unlikely to have "a significant, consequential effect on other natural resources"; and "the direct or consequential impact on animals or vegetation will not approach a critical number" as a result of the project. The court concluded that "[a]ll-

---

**7.** The court of appeals initially adopted what later became known as the *Wacouta* test in an earlier unpublished opinion in *State by Kasden v. Independent Sch. Dist. No. 97, Moose Lake,* No. C7–88,1597, 1989 WL 14900, at *3–4 (Minn.App. Feb.28, 1989). In *Kasden,* the court of appeals applied factors borrowed from the Michigan

Court of Appeals, in concluding that there was no materially adverse effect on the environment from the clearing of 75 to 80 trees to create a driveway to a school parking lot. *Id.* at 3 (citing *City of Portage v. Kalamazoo County Rd. Comm'n,* 136 Mich.App. 276, 282, 355 N.W.2d 913, 916 (Mich.Ct.App.1984)).

though some destruction and impairment will occur it does not rise to the level of a MERA violation." The court of appeals agreed, concluding that "[a]bsent satisfaction of the [*Wacouta*] test, judicial intervention via MERA is not proper." *Schaller*, 1996 WL 438845, at *2.

■ Schaller and the MCEA argue that this court's adoption of the *Wacouta* test would significantly restrict the scope of MERA because it would limit protection under the statute to only "rare, endangered or unique resources" and allow injunctive relief only from conduct affecting "critical numbers" of plants or wildlife. In so restricting the statute, the MCEA contends this court would be forsaking the broad remedial purposes of MERA and unnecessarily departing from this court's prior approach of determining what constitutes a "materially adverse" effect on the facts of each case, without any specific limiting factors.

The county counters that the legislature expressly limited conduct that may be enjoined under MERA to that which is likely to *materially adversely affect* the environment. *See* Minn.Stat. § 116B.02, subd. 5. Because the legislature provided no definition of the phrase "materially adversely affects * * * the environment," the courts must fashion a standard for determining when the environmental effect of proposed conduct rises to such a level. The county argues that the four-factor *Wacouta* test is consistent with the judicial responsibility to construe the statute in a manner consonant with its purpose of promoting both the preservation and the productive use of our state's natural resources. We agree.

We have not had occasion in our prior decisions to adopt a definitive test of when conduct "materially adversely affects the environment" under MERA. When the threshold materiality requirement has plainly been met, our cases have largely implicitly assumed materiality without discussion and proceeded to consideration of feasible and prudent alternatives. *See, e.g., Archabal*, 495 N.W.2d at 421–22; *Urban Council on Mobility v. Minnesota Dep't of Natural Resources*, 289 N.W.2d 729, 734 (Minn.1980); *State by Powderly v. Erickson*, 285 N.W.2d 84, 87–88 (Minn.1979); *PEER*, 266 N.W.2d at 867–68.

Nonetheless, the statute unambiguously limits conduct subject to relief under MERA to conduct that "materially adversely affects" or is "likely to materially adversely affect the environment." Minn.Stat. § 116B.02, subd. 5. Because the statute fails to define "materially adversely affects" or is "likely to materially adversely affect," it is appropriate for this court to provide guidance to assist the lower courts in making this threshold determination in cases in which materiality is not so apparent.

We believe the *Wacouta* test is both consistent with our prior caselaw and harmonious with the environmental policy objectives underlying MERA. It is true that our prior caselaw suggests a broad scope of protection under MERA. *See, e.g., Krmpotich v. City of Duluth*, 483 N.W.2d 55, 56–57 (Minn.1992) (holding that 1.85 acre wetland qualified as natural resource protectible under MERA despite its degraded condition, but holding that there was no feasible and prudent alternative to development); *Floodwood–Fine Lakes Citizens Group v. Minnesota Envtl. Quality Council*, 287 N.W.2d 390, 399 (Minn. 1979) (noting state's policy of nonproliferation of power lines and stating that "paramount" concern for natural resources means "superior to all others"); *Freeborn County by Tuveson v. Bryson (Bryson II)*, 309 Minn. 178, 188, 243 N.W.2d 316, 321 (1976) (noting that "it is the duty of the courts to support the legislative goal of protecting our environmental resources"); *Freeborn County by Tuveson v. Bryson (Bryson I)*, 297 Minn. 218, 225–29, 210 N.W.2d 290, 297–98 (1973) (granting temporary injunction against the taking of .7 acres of a marsh out of a 7 acre tract). Even though we have broadly interpreted the statute, we have recognized that the statute requires something more than merely an adverse environmental impact to trigger its protection. In *Bryson II*, we noted:

In addition, we think the record adequately establishes that this particular marshland does have *unique characteristics* that the Act was intended to protect. An ecological unit in itself, it is also part of

a larger drainage area several miles long * * *. The marsh involved here contains waterfowl and upland game birds, both of which have *greatly decreased in numbers* in Minnesota during the past 10 or 15 years. In the same period, marshlands and other natural habitats *have been greatly reduced.*

309 Minn. at 188, 243 N.W.2d at 321–22 (emphasis added).

We believe the *Wacouta* factors are manifestly consistent with the limiting factors we recognized in *Bryson II* and merely provide a common sense framework for determining whether or not the threshold materiality issue is met on the facts of each case.

Schaller's contention that application of the *Wacouta* factors restricts protected resources to those that are unique, endangered or threatened, or reduced to critical numbers, is not well-founded. Both the *Wacouta* court and the district court in this case recognized that not all the *Wacouta* factors need be met in order for a materially adverse effect to be found. *See Wacouta,* 510 N.W.2d at 30 (noting that "while all four factors should be considered, the weight given to each factor and the potential impact of the proposed action will depend in large part on the type and characteristics of the resource involved in the specific case"); *State by Schaller v. County of Blue Earth,* No. C5–96–0260 (5th Dist.Minn. May 10, 1996) (order granting directed verdict) (describing the *Wacouta* test as a "four-part *balancing* test") (emphasis added). Moreover, the *Kasden* court specifically noted that "uniqueness is not part of the definition of 'natural resource' under MERA" and is not required to satisfy the four-factor test. *Kasden,* 1989 WL 14900, at *2–3 (listing four factors as "factors which should be considered" in determining whether conduct materially adversely affects the environment).

Because we conclude that the *Wacouta* factors, as applied by the lower courts, provide an adequate test of whether conduct is likely to materially adversely affect the environment, we conclude that the district court did not err in granting the county's motion to dismiss Count II of Schaller's complaint based on the facts presented at trial. In the

interests of providing a comprehensive measure of materiality, however, we offer the following modified formulation of the *Wacouta* factors as a guideline for future determinations of whether or not conduct materially adversely affects or is likely to materially adversely affect the environment under Minn.Stat. § 116B.02, subd. 5:

(1) The quality and severity of any adverse effects of the proposed action on the natural resources affected;

(2) Whether the natural resources affected are rare, unique, endangered, or have historical significance;

(3) Whether the proposed action will have long-term adverse effects on natural resources, including whether the affected resources are easily replaceable (for example, by replanting trees or restocking fish);

(4) Whether the proposed action will have significant consequential effects on other natural resources (for example, whether wildlife will be lost if its habitat is impaired or destroyed);

(5) Whether the affected natural resources are significantly increasing or decreasing in number, considering the direct and consequential impact of the proposed action.

We emphasize that these factors are not exclusive and that each factor need not be met in order to find a materially adverse effect. Rather, the factors are intended as a flexible guideline for consideration as may be appropriate based on the facts of each case.

## II.

■ We next consider Schaller's contention that the district court erred in granting the county's motion for summary judgment on Count I of his complaint, alleging a future noise violation. The district court concluded that the projected violation was "too speculative, premature and minimal" to establish a prima facie case under MERA. The court of appeals affirmed, noting that there was no current noise violation and concluding that the future noise violation was "unduly speculative" because (a) it was not projected to occur until 2010; (b) the final EIS describes

the violation as "potential" rather than certain; and (c) the alleged violation assumes both that existing noise standards will be in force in 2010 and that the county will not be able to obtain a variance. *Schaller*, 1996 WL 438845, at \*2. Moreover, because the highway under construction is a two-lane highway and the projected noise violation assumes a four-lane highway, the court of appeals concluded that even when the evidence was viewed in the light most favorable to him, Schaller could not establish a prima facie case that a future noise violation is "likely" under MERA. *Id.*

We agree. We find persuasive the reasons cited by the court of appeals and also note that the EIS noise projections relied upon by Schaller were not prepared for the purpose of establishing the absolute noise level projected at any given monitoring site, but rather for the purpose of comparing the noise effects of the various alternative routes under consideration. Because the noise level projections were calculated for the purpose of providing a comparative and not absolute analysis; relied on projected traffic levels; and assumed the projected future construction of a four-lane highway, we conclude that even when viewed in the light most favorable to Schaller, the projected violations are simply too speculative to present a fact issue for trial. *See Bob Useldinger & Sons, Inc. v. Hangsleben*, 505 N.W.2d 323, 327 (Minn. 1993).

Affirmed.

STRINGER and GARDEBRING, JJ., specially concur.

STRINGER, Justice, concurring specially.

While I agree with the outcome the court reaches in this case because clearly the affected area was relatively small, it was already significantly degraded environmentally and there was evidence to suggest that the proposed development would, in fact, lead to an improvement of the environmental quality of the area, I write separately to express my belief that the statutory scheme is fully adequate to instruct on how its policies should be enforced, and that the *Wacouta* test and the "modified-*Wacouta*" test the court endorses

inappropriately restrict the definition of material adverse effect on the environment in a manner that the legislature did not intend.

The legislature's "paramount concern" in enacting section 116B was the "protection of [the state's] air, water, land and other natural resources \* \* \*." Minn.Stat. § 116B.04. Accordingly, the conduct violating the statutory purposes is very broadly defined—"any conduct which materially adversely affects or is likely to materially adversely affect the environment" is deemed sufficient to trigger the statute. Minn Stat. § 116B.02, subd. 5; *see also id.* § 116B.04. The broad statutory protection against the whole range of environmental harms is in striking contrast to the four-part test announced in *Wacouta*, with its much narrower focus on whether rare or critical plant or animal populations will be affected by the proposed action—a much too restrictive approach that can lead to absurd results. Development will often have a material impact on the environment despite the fact that the resources harmed are not rare, irreplaceable or critical in the sense that the development will lead to the permanent loss of entire plant or animal populations in the affected area. Yet under *Wacouta*, the destruction of a lake's entire population of game fish would not necessarily be deemed a material adverse effect on the environment if the lake could be restocked with fingerlings the following year; an entire mature forest could be stripped if the property could be replanted with saplings of the same species. Surely, this is not what the legislature intended when it set out to "create and maintain within the state conditions under which human beings and nature can exist in productive harmony \* \* \*." Minn. Stat. § 116B.01.

The court of appeals premised its adoption of the four-part test in *Wacouta* on the notion that to do otherwise would "construe MERA as prohibiting virtually all human enterprise." *State ex rel. Wacouta Township v. Brunkow*, 510 N.W.2d 27, 30 (Minn. App.1993). That is simply not the case. Under the statutory scheme, a finding that a particular development will have a material adverse effect on the environment does not mean that the development is prohibited; it

merely shifts the burden to the party proposing the development to show that there is no "feasible and prudent alternative" to the contested action. Hence, there was no need for the court to fashion a test designed to narrow the clear and broad language of the statute.

We need not necessarily co-opt Justice Stewart's famous definition of obscenity—"I know it when I see it," *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring)—to realize that certain concepts are not amenable to precise definition and must therefore be determined on a case-by-case basis. Whether an action will "materially adversely affect the environment" is one such determination. A "material" effect is one "of real importance or great consequence." Webster's Third New International Dictionary 1392 (1961). A great many actions undoubtedly have an important effect on the environment despite the fact that they do not harm rare or critical species and the determination of whether the adverse environmental effects of a proposed course of action are "material" is therefore not reducible to a mechanical four-part test focusing on the harm to such species. Rather, determinations of this nature are better made on the facts of each particular case, keeping in mind the broad environmental protection the statute was intended to provide. This court and others have recognized as much in the past. *See, e.g., Freeborn County by Tuveson v. Bryson,* 297 Minn. 218, 226–28, 210 N.W.2d 290, 296–97 (1973) (stating that the court is not justified in grafting exceptions upon the broad, comprehensive language of MERA, holding that highway project that would disturb the peace and solitude of a natural marsh would have a material effect on the environment); *River Road Alliance, Inc. v. Corps of Engineers,* 764 F.2d 445, 449–51 (7th Cir.1985) (interpreting National Environmental Policy Act provision requiring environmental impact statements for actions having "significant" environmental impact, stating that "[t]he statutory concept of 'significant' impact has no determinate meaning"), *cert. denied,* 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986).

In the court's attempt to soften and modify the *Wacouta* standards in this case, it seems to recognize that the four-part *Wacouta* test applied by the lower courts does not adequately reflect the broad wording of the statute and therefore adds an additional consideration: "[t]he quality and severity of any adverse effects of the proposed action on the natural resources affected." I fail to see, however, how directing courts to consider the "quality and severity" of the adverse effects of an action sheds any further light on what will constitute a "material" effect on the environment. The determination of whether an effect is "material"—*i.e.,* important or of consequence—necessarily involves a consideration of the quality and severity of the effect. As such, the court has taken what should be the sole consideration under the statute and turned it into merely one part of a five-part test. Despite the court's admonition that the modified-*Wacouta* standards are intended as a flexible guideline and that each factor need not be met, the new test will no doubt create a tendency, in all but the most severe cases of environmental degradation, for courts to rely on the absence of the other four factors in holding that MERA does not apply. As a result, a statute that was intended to provide broad based environmental protection whenever feasible will be increasingly construed to apply to only the most rare or fragile ecosystems.

The object of statutory interpretation is to determine and give effect to the intent of the legislature. *Homart Dev. Co. v. County of Hennepin,* 538 N.W.2d 907, 911 (Minn.1995) (citing Minn.Stat. § 645.16). The words of a statute must be construed according to their common and approved usage and, where the legislature's intent is clearly manifested in the plain language of a statute, the court is not free to read restrictions into the statute. *See Phelps v. Commonwealth Land Title Ins. Co.,* 537 N.W.2d 271, 274 (Minn.1995); *Kugling v. Williamson,* 231 Minn. 135, 139, 42 N.W.2d 534, 538 (1950). The introductory provisions of section 116B make it clear that, in enacting MERA, the legislature intended to bestow upon citizens a broad right to challenge development having an adverse effect on environment. Accordingly, the legislature determined that any "material" ad-

verse impact on the environment would be sufficient to trigger the statute. The five-part test endorsed by the court narrows the common definition of "material" as well as the broad policy goals underlying the statute in a manner clearly unintended by the legislature.

Finally, while I agree with the court's conclusion that the evidence offered by Schaller with respect to allegations that the noise ordinance would be violated was insufficient to establish a prima facie case that such a violation is "likely," I wish to underscore that all environmental impact statements are, by their very nature, predictions of future impact on the environment and are therefore somewhat speculative. We therefore should admit of a high tolerance for the speculative nature of predictions of the impact of proposed conduct on the future of our environment and claims should be dismissed only where, as here, the evidence is insufficient to show even a reasonable basis for concluding that the future harm will come to pass.

GARDEBRING, Justice (concurring specially).

I join in the special concurrence of Justice Stringer.