**STATE of Minnesota, by FORT SNELLING STATE PARK ASSOCIATION, Appellant,**

**v.**

**MINNEAPOLIS PARK AND RECREATION BOARD, City of Minneapolis, Minnesota Department of Natural Resources, Respondents.**

No. C4–03–36.

Court of Appeals of Minnesota.

Dec. 23, 2003.

---

Mark R. Anfinson, Minneapolis, MN, for appellant.

Brian F. Rice, Minneapolis, MN, for respondent Minneapolis Park and Recreation Board.

Corey M. Conover, Minneapolis, MN, for respondent City of Minneapolis.

Matthew B. Seltzer, St. Paul, MN, for respondent Minnesota Department of Natural Resources.

Considered and decided by WRIGHT, Presiding Judge; TOUSSAINT, Chief Judge; and G. BARRY ANDERSON, Judge.

## OPINION

TOUSSAINT, Chief Judge.

Appellant Fort Snelling State Park Association (FSSPA) brought a declaratory-

judgment action against respondents Minneapolis Park and Recreation Board (the park board) and the Minnesota Department of Natural Resources (DNR), seeking a declaration that the outdoor athletic center planned by the park board in an area known as the Fort Snelling Polo Grounds would impair a historical resource within the meaning of the Minnesota Environmental Rights Act (MERA). The district court concluded that the polo grounds were a historical resource and although the athletic center would result in some impairment to the integrity of the polo grounds as an open space, it would not inflict a material adverse effect. Because we conclude that the district court correctly applied the law and did not abuse its discretion in finding facts, we affirm.

## FACTS

In January 2001, appellant FSSPA filed this action, seeking protection of the Fort Snelling Polo Grounds as a historical resource under MERA. Respondent DNR had just entered into a lease agreement with the respondent park board, which had adopted a plan to construct an outdoor athletic center on the polo grounds. The plan was for softball, baseball, and soccer fields with outdoor lighting, grandstands, backstops, and auxiliary structures surrounded by cyclone fencing. The FSSPA sought a declaratory judgment that the "highly intrusive and unnecessary structures" would impair the historical and natural resources protected by MERA, and an injunction preventing the park board from proceeding with the development.

Fort Snelling consists of two sites referred to as the Old Fort and the New Fort. The Old Fort, constructed between 1820 and 1824, and reconstructed and preserved since then, is not at issue here. The New Fort, constructed between 1879 and 1890, lies on the 141–acre Upper Bluff located across Highway 55 from the Old Fort. One part of the New Fort, the polo or artillery parade grounds, is at the center of this dispute. It is bordered by Taylor Avenue to the east, Minnehaha Avenue to the south, Bloomington Road to the west, and Highway 55 to the north. Across Taylor Avenue to the east of the polo grounds are the old army hospital and barracks buildings, also known as the Taylor Avenue buildings.

The Taylor Avenue buildings were first constructed to serve as the headquarters of the Department of the Dakota in 1879. A regiment of 200–700 troops was stationed there with the purpose of protecting the westward migration of settlers. Although the department was abolished in 1890, the New Fort continued to be used as a military base until it was decommissioned in 1946. A recent study of the Upper Bluff area concluded that any reuse plan must preserve or reuse the Taylor Avenue buildings, with an estimated cost between $33–43 million.

The polo grounds are an open space. It was a public garden until about 1879, and were likely used for drilling exercises until 1890. A 1903 map labels the open space the "Artillery and Infantry Parade Grounds." Since 1900, the grounds have been used for both military and recreational purposes, including polo, baseball, and races. A low-rise concrete grandstand was constructed in the 1930s, and polo was played there until 1939, when horses were no longer kept at the fort. After the fort was decommissioned, the space was used almost exclusively for recreational purposes with several multi-use fields for baseball, softball, and soccer.

In 1960, while still owned by the federal government, Fort Snelling was designated a National Historic Landmark. Six years later, Fort Snelling was included in the National Register of Historic Places. Ini-

tially, the boundaries were ill-defined, but in 1978 they were redrawn to include all of the Upper Bluff area. Fort Snelling was also designated a State Historic Site and a State Historic District.

In 1971, the federal government transferred the whole Upper Bluff area to the DNR for use only as a public park or for recreational purposes. In 1992, the park board began leasing the polo grounds and the golf course from the DNR. Five years later, the park board appointed a committee on youth sports that recommended increasing and upgrading Minneapolis sports facilities to achieve parity with the fields available to suburban youth. Fort Snelling's Polo Grounds were selected as the site. The park board then formed a Citizen's Advisory Committee (committee) to assist in the development plan for a youth athletic center. Committee members included state and federal legislators and representatives from the Minnesota Historical Society (MHS), National Park Service (NPS), Department of Veteran Affairs, and others. In 1999, the committee approved the initial design, and the state legislature passed a bill authorizing the state to lease the polo grounds to the park board for recreation purposes for 30 years.

Because the proposed youth athletic center included land owned by the DNR and included on the state and national registers of historic properties, the plan was subject to review by the MHS under the Minnesota Historic Sites Act, Minn. Stat. § 138.665. The DNR was also required to submit the plan for input from the National Park Service (NPS). The federal review process culminated in a Memorandum of Agreement (memorandum), incorporating changes to minimize the adverse effect of the lights, bleachers, and fencing, and included mitigation measures requiring that three interpretive events be staged on the grounds an-

nually and that a water main loop be constructed to irrigate the fields and redevelop the Taylor Avenue buildings. The MHS, DNR, Department of Veteran's Affairs, and the park board signed the memorandum. It was then submitted to the National Advisory Council on Historic Preservation, which also accepted the memorandum.

On completion of the federal process, the NPS issued a finding of no significant impact under the National Environmental Policy Act and approved the Amended Program of Utilization and a new 30–year lease between the DNR and the park board. Both the amended program and the lease incorporated the memorandum by reference and required the park board to obtain prior written approval from both the MHS and the NPS before undertaking any new development activity.

On April 25, 2001, the final construction plans for the athletic center were approved by the NPS and shortly thereafter by the MHS. Gray steel light standards and black vinyl fencing were chosen to blend into the surroundings and the light standards were "aligned to compliment the military aspect of the site." At the time of trial in February 2002, the center was 90% complete and on March 20, the trial court, accompanied by counsel for the parties, visited the site.

On May 1, 2002, the trial court filed its findings, conclusions, and order denying the relief requested by the FSSPA and entering judgment for respondents. Thereafter, the parties filed cross-motions for amended findings and conclusions, and the FSSPA moved in the alternative for a new trial. The post-trial motions were denied and both the FSSPA and the city appeal.

## ISSUES

1. Did the district court err in its conclusion that the polo grounds were a

protected historical resource under MERA?

2. Did the district court err in its conclusion that the youth athletic center did not materially adversely affect the historic resource under MERA?

3. Do the administrative processes of the Minnesota and National Historic Sites Acts preclude an action under MERA?

4. Did the trial court err in denying post-trial motions?

## ANALYSIS

■ The appellate court reviews the district court's conclusions of law in a Minnesota Environmental Rights Act (MERA) case de novo. *State ex rel. Wacouta Township v. Brunkow Hardwood Corp.*, 510 N.W.2d 27, 29 (Minn.App.1993). Findings of fact are subject to the clearly erroneous standard. *State by Archabal v. County of Hennepin*, 495 N.W.2d 416, 421 (Minn.1993).

## I.

■ MERA, Minn.Stat. §§ 116B.01–.13 (2002), creates a cause of action to protect, preserve, and enhance natural resources of this state. The act defines "natural resources" as including

all mineral, animal, botanical, air, water, land, timber, soil, quietude, recreational and historical resources. Scenic and esthetic resources shall also be considered natural resources when owned by any governmental unit or agency.

Minn.Stat. § 116B.02, subd. 4. The first element of a prima facie MERA claim is to show the existence of a protectable resource. *State by Powderly v. Erickson*, 285 N.W.2d 84, 87 (Minn.1979).

"Historical resources" are not defined within MERA, but the Minnesota Supreme Court has identified factors that should be taken into account in determining whether a building falls under MERA's protection. *Archabal*, 495 N.W.2d at 421. A court should look "principally to the criteria used to determine what buildings are included on the National Register of Historic Places." *Id.* These criteria, from the code of federal regulations, are whether a site has "significance in American history, architecture, archeology, and culture" and whether it possesses "integrity of location, design, setting, materials, workmanship, feeling and association." *Powderly*, 285 N.W.2d at 88 (quoting 36 C.F.R. § 800.10(a) (current version at 36 C.F.R. § 60.4 (2003))). Additionally, a historical site typically would also be characterized by one of the following:

(1) be associated with events that have made a significant contribution to the broad patterns of our history; or

(2) be associated with the lives of persons significant in our past; or

(3) embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or

(4) have yielded, or may be likely to yield, information important in prehistory or history.

*Id.*

■ The City of Minneapolis challenges the district court's conclusion that the polo grounds are a historical resource. It argues that the FSSPA failed to prove that the polo grounds, independent of the larger Fort Snelling, were a historical resource.

■ There is no Minnesota caselaw determining whether designation of a historic site necessarily designates its parts

as independent historic sites. We need not resolve that specific issue, however, to concur with the district court's conclusions that both the greater fort and the polo grounds themselves are historical resources under *Powderly*. It is clear from *Powderly* that district courts are accorded considerable latitude for a full consideration of the historical context of a property. *Id.* at 88. First, the federal historic site criteria include consideration of a site's "integrity of location ... [and] feeling" and specifically allow consideration of sites that represent a significant and distinguishable entity whose components may lack individual distinction. 36 C.F.R. § 60.4 (2003). Second, these criteria expressly do not control the district court, but are provided as guidance. *Powderly*, 285 N.W.2d at 88. Third, expert testimony may provide additional historically significant characteristics of a site. *Id.* Therefore, the city's narrow application of the historic sites criteria lacks support.

The record clearly supports the district court's finding that the polo grounds are a historical resource. Historic preservationists who conduct historic site reviews are concerned with how the various elements of a historic district, including open spaces and fields, relate to one another. Russell Fridley, director of the MHS for 30 some years, testified that the Old Fort played the biggest role in Minnesota becoming a state, but the New Fort was particularly important as the headquarters for the Department of the Dakota from 1879–1890 and it paved the way for the admission of North Dakota, South Dakota, and Montana to statehood and for the opening of the West for settlement.

The polo grounds themselves were used by the troops for drills and other exercises, but also served a social, festive function as a gathering spot for Minnesotans. Until World War II, there were weekly parades and daily guard mounts to which the public was invited. Fridley opined that the polo grounds helped define the New Fort and considered it an integral part of the Department of the Dakota and the centerpiece of the fort. Although the polo grounds have had a mixed use in the last half-century, their significance in American and Minnesota history as part of Fort Snelling is well grounded.

The city's emphasis on the poor condition of the Taylor Avenue buildings is only one of many factors to be considered in the historical resource analysis of the polo grounds. While there was testimony that the buildings are in a state of disrepair, there was also testimony that they could be renovated and that access to water made possible by the athletic center would make renovation more likely. In any event, the status of the buildings does not determine the historical status of the polo grounds.

In light of the evidence showing the historical significance of the polo grounds and their integral role as a part of the greater Fort Snelling historic site, the district court properly concluded that the polo grounds are a historical resource under MERA. Therefore, the FSSPA satisfied the first element of its prima facie MERA case.

## II.

The second element in a prima facie case under MERA is whether the proposed project will inflict a material adverse effect on the protectable resource. *See Minn. Public Interest Research Group v. White Bear Rod & Gun Club*, 257 N.W.2d 762, 768 (Minn.1977) (stating that proof of pollution, impairment, or destruction of protectable resource may be made by showing conduct complained of materially, adversely affects resource). Minneso-

ta courts weigh five factors to determine whether the effect is material and adverse:

(1) The quality and severity of any adverse effects of the proposed action on the natural resources affected;

(2) Whether the natural resources affected are rare, unique, endangered, or have historical significance;

(3) Whether the proposed action will have long-term adverse effects on natural resources, including whether the affected resources are easily replaceable . . . ;

(4) Whether the proposed action will have significant consequential effects on other natural resources . . . ;

(5) Whether the affected natural resources are significantly increasing or decreasing in number, considering the direct and consequential impact of the proposed action.

*State by Schaller v. County of Blue Earth,* 563 N.W.2d 260, 267 (Minn.1997). The factors are not exclusive and need not all be met to constitute a material adverse effect. *Id.*

The FSSPA argues that the district court's use of the terms "serious" and "long-term" to describe the adverse effects of the athletic center were the equivalent of a "material" effect under *Schaller.* Read in context, however, the trial court's findings stated (1) that the effect of the lighting, fencing, backstops and bleachers was "serious but not so severe as to impair the[ ] basic character [of the polo grounds] as an open space," and (2) that the structures will have a long-term effect "but the effect is reversible because they can be removed in the future without causing any permanent degradation to the open space."

 The district court was guided, not controlled by the *Schaller* test. The first factor expressly provides for consideration of the "quality and severity" of any adverse effects. Contrary to the FSSPA's argument that "[n]o additional gradations of severity are relevant," the first factor instructs that severity is relative and must be weighed and analyzed. *Schaller,* 563 N.W.2d at 267. Similarly, another *Schaller* factor provides for consideration of the long-term effect and whether the resources are replaceable. *Id.* In the context of the polo grounds, the district court properly considered the nature of the athletic center improvements and that simple removal of the structures would return the polo grounds to their original open space. The court properly considered and weighed the factors to conclude the proposed improvements did not constitute material adverse effects.

 The FSSPA also argues that the district court's decision was flawed by its heavy reliance on social and political factors having nothing to do with the specific and exclusive criteria established by MERA. This argument also lacks merit. First, the *Schaller* factors are expressly not exclusive. Second, the findings do not reflect undue reliance on social or political factors. Third, the FSSPA's reliance on a standard for establishing an affirmative defense under MERA is inapplicable to the *Schaller* test for determining the materiality of the adverse effect.

*Schaller* encourages consideration of all appropriate factors "based on the facts of each case" consistent with its "flexible" guidelines. *Id.* Thus, the district court properly considered the effect of the athletic center on other natural resources, including the positive effects of reinvigorating the area on the presently abandoned historical buildings. Similarly, the court's acknowledgement of the needs of the city's youth—not just for recreational facilities, but also for exposure to historical resources like Fort Snelling—is consistent with the broad purposes of protecting historical resources. The court properly con-

cluded that more people would learn the history of the site by visiting the site. Therefore, the court correctly applied the law and concluded that there was no material adverse effect.

### III.

▮▮▮ Respondent park board contends that the district court erroneously concluded that it had de novo jurisdiction over the MERA. It argues that the MHS and NPS's administrative processes required for approval of the athletic center preclude a MERA action.

The state administrative approval of the athletic center was required under the Minnesota Historic Sites Act, Minn.Stat. §§ 138.661–.6691 (2002). The act requires that "[b]efore carrying out any undertaking that will affect designated or listed properties ... the state department or agency shall consult with the Minnesota historical society ... to determine appropriate treatments and to seek ways to avoid and mitigate any adverse effects on designated or listed properties." Minn. Stat. § 138.665, subd. 2. If the state department or agency and the MHS agree in writing to a course of action, the project may proceed. *Id.* The state "shall cooperate" with the MHS. Minn.Stat. § 138.666.

The federal administrative process required by the federal government's 1971 deed to the DNR was the so-called "section 106 process" authorized by the National Historic Preservation Act. 16 U.S.C. §§ 470–470x–68 (2002); 36 C.F.R. § 800.1(a) (stating the "[s]ection 106 of the National Historic Preservation Act" process seeks to accommodate historic preservation concerns with the needs of federal undertakings through consultation). After the agency official determines whether an undertaking has the potential to cause effects on historic properties, the agency and historic preservation officer consult to de-

termine the historic significance of the property and to assess whether there is an adverse effect. 36 C.F.R. § 800.5 (2002). Consultation is used to resolve an adverse effect finding. *Id.,* § 800.5(d)(2). If the parties agree on how to resolve the adverse effects, they execute a memorandum of agreement. *Id.,* § 800.6(c).

No contested case hearings preceded this MERA action, and the parties do not seek review of an agency action pursuant to these administrative processes. Therefore, the Minnesota Administrative Procedure Act is inapplicable and the district court properly exercised de novo jurisdiction. Nevertheless, the park board's primary argument is that the administrative decisions on the athletic center are dispositive of this MERA action.

We conclude there is no support for this contention. The legislature expressly stated that the "rights and remedies provided [in MERA] shall be in addition to any administrative, regulatory, statutory, or common law rights and remedies now or hereafter available." Minn.Stat. § 116B.12 (2002). Furthermore, there is no basis for estoppel of claims or issues because the administrative proceedings did not involve hearings or agencies acting in judicial or quasi-judicial capacities. *See Surf & Sand Inc. v. Gardebring,* 457 N.W.2d 782, 787 (Minn.App.1990) (res judicata applies to administrative proceedings when agency acts in judicial capacity and resolves disputed issues that the parties have had adequate opportunity to litigate), *review denied* (Minn. Sept. 20, 1990). Thus, this civil action under MERA was authorized regardless of administrative processes.

### IV.

▮▮▮ The district court denied the parties' cross-motions for amended findings and appellant's motion for a new trial. The trial court's denial of the parties' post-

trial motions for amended findings or a new trial will not be disturbed on appeal absent a clear abuse of discretion. *Preferred Fin. Corp. v. Quality Homes, Inc.*, 439 N.W.2d 741, 743 (Minn.App.1989).

In the trial court's denial of the motions for amended findings and the motion for a new trial, the court stated that the FSSPA did not satisfy the *Lewis* standard. In *Lewis v. Lewis*, this court stated that a proper motion for amended findings must both identify the alleged defect in the challenged findings and explain why the challenged findings are defective. 572 N.W.2d 313, 315 (Minn.App.1997), *review denied* (Minn. Feb. 19, 1998). If there is conflicting evidence, a court is not compelled to amend. *Id.* at 316. The trial court concluded that FSSPA's motion simply showed its disagreement with the findings and nothing more.

We agree that the *Lewis* standard and basic principles for motions to amend support the trial court's ruling on the motions. *See generally* 2 Herr & Haydock, *Minnesota Practice* § 52.15, at 173–74 (1998).[1] The bases proffered for the amendments did not compel the trial court to make the amendments. For example, the court need not make findings simply because the FSSPA believed them to be material to issues tried to the court. Similarly, the court need not make findings on the affirmative defense if the court concluded that FSSPA had not made a prima facie case under MERA. The remaining requested changes in the conclusions of law were simply disagreements between the court and FSSPA's legal conclusions. Therefore, the trial court did not abuse its discretion in its denial of FSSPA's motions for amended findings and a new trial.

## DECISION

The trial court's jurisdiction of this MERA claim was not precluded by the administrative proceedings. The trial court did not err in its determination that the polo grounds constituted a historical resource under MERA or in its application of the *Schaller* factors to conclude that the athletic center would not inflict a materially adverse effect on the polo grounds or Fort Snelling. In light of the trial court's well-supported findings and conclusions, it did not abuse its discretion in denying post-trial motions.

**Affirmed.**

---

1. The relevant part of *Lewis* did three things: It articulated the components of a motion for amended findings, it ruled that the motion filed in that case lacked those components, and it concluded that this lack caused the motion to be "improper" and to not toll the time to appeal under the then—existing Minn. R. Civ.App. P. 104.04. Subsequently, the Rules of Civil Appellate Procedure were amended, rule 104.04 was deleted, and rule 104.01 was revised to include provisions stating that a "proper and timely" motion of a type listed in Minn. R. Civ.App. P. 104.01, subd. 2 temporarily tolled the time to appeal. Later, the supreme court issued *Madson v. Minn. Mining & Mfg. Co.*, 612 N.W.2d 168 (Minn.2000), addressing what constituted a "proper" motion for purposes of Minn. R. Civ.App. P. 104.01, subd. 2. In doing so, the supreme court rejected the idea that whether a motion was "proper" was related to the merits of the motion. *Id.* at 171. *Madson* then concluded that "the test for determining whether a motion is authorized, and therefore proper, is to determine whether on the face of the document the party has filed a motion that is expressly allowed under subdivision 2 [of rule 104.01]." *Id.* at 172. Thus, while *Madson* overrules any aspect of *Lewis* suggesting that the merits of a motion for amended findings bear on whether an appeal time is tolled, *Madson* leaves in tact *Lewis's* articulation of the components of a motion for amended findings. District courts should, therefore, continue to use *Lewis* to determine whether a motion for amended findings has the necessary components and, if it does, then address whether to grant the motion.